**Laurie Isaac BROAD, For Himself and all Others Who are Similarly Situated, Plaintiffs–Appellants,**

v.

**SEALASKA CORPORATION; Sealaska Elder Settlement Trust; Patrick Anderson; Charles Carlson; Joseph Demmert, Jr., et al., Defendants–Appellees.**

No. 94–35310.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 1995.

Decided May 16, 1996.

Fred W. Triem, Petersburg, Alaska and Douglas M. Branson, Professor of Law, Seattle University, Tacoma, Washington, for plaintiff-appellant.

E. Budd Simpson, L. Merrill Lowden, and Ronald W. Lorensen, Simpson, Tillinghast, Sorensen & Lorensen, Juneau, Alaska, for defendants-appellees.

Bruce N. Edwards and Michael R. Sorensen, Sorensen & Edwards, Seattle, Washington, for the amicus.

Before: HALL, WIGGINS and KLEINFELD, Circuit Judges.

Opinion by Judge HALL; Dissent by Judge KLEINFELD.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Sealaska Corporation, a Native regional corporation organized under the Alaska Native Claims Settlement Act (ANCSA), established a "settlement trust" as authorized in an amendment to ANCSA. This trust, titled the Elders' Settlement Trust (EST), provides a one time $2000 payment to each Sealaska shareholder who reaches sixty-five years of age. The plaintiffs, who are shareholders of Sealaska under age sixty-five, filed a class action complaint in Alaska state court claiming that creation of the settlement trust violated state corporations law and the provisions of ANCSA. Sealaska removed to federal district court and the parties stipulated to deferring the request for class certification.

The plaintiffs appeal from the district court's order granting summary judgment in favor of Sealaska on all claims. The district court had jurisdiction under 28 U.S.C. § 1441(a) and this Court has jurisdiction under 28 U.S.C. § 1291. We review a district court's grant of summary judgment de novo. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995). We affirm.

I

Congress enacted ANCSA, 43 U.S.C. § 1601 et seq., in 1971 "to achieve a fair and just settlement of all aboriginal land [in Alaska] ... with maximum participation by Natives in decisions affecting their rights and property." 43 U.S.C. § 1601 note (Supp. 1995) (Congressional Findings and Declaration of Policy for ANCSA Amendments of 1987). To accomplish this goal, ANCSA created regional corporations to hold and manage the Native land settlements. Congress amended ANCSA in 1987 to ensure the continuing success of the Native corporations. The amendments included a provision permitting a corporation to create a "settlement trust," a vehicle into which a corporation could transfer assets that were to be used for the health, education, and welfare of the trust beneficiaries. Assets held in these trusts enjoy protection from the corporation's creditors.

Sealaska, which is the Native Corporation for the Southeast Panhandle of Alaska, saw the settlement trust as a means to recognize the contributions of its elder shareholders and to assist them financially. The board of directors adopted a resolution to establish the EST, a trust that would be funded with corporate assets, and that would distribute $20 per share to shareholders aged sixty-five or older.

The board sent to all shareholders a proxy statement for the 1991 shareholder meeting and a description of the proposal, both of which included information about the benefits and disadvantages of the EST. The resolution received an affirmative vote from 50.7 percent of all outstanding shares, and thereby passed. The board appointed trustees and authorized the President and CEO to prepare the trust document. As of December 10, 1991, the trust has been operating according to the terms of the resolution.

In September 1992 the plaintiffs filed a class action suit in the Alaska Superior Court claiming that the cash disbursements paid out through the trust constitute a constructive dividend. They assert that this dividend is an illegal distribution because it discriminates between Sealaska shares of the same class.

Sealaska removed the case to federal court, and the parties filed cross-motions for

summary judgment. In their answer to Sealaska's motion, the plaintiffs raised several additional claims. First, they argued that the proxy materials Sealaska supplied to its shareholders did not comply with applicable law because the information given was misleading and omitted material facts. Second, they argued that nonvoting shareholders should have been allowed to vote on the establishment of the EST. Finally, they claimed that the EST, under authority of federal law, takes property from the shareholders without just compensation, and thus violates their rights under the Fifth Amendment of the United States Constitution.

The district court issued several orders, which, taken together, entered judgment in favor of Sealaska and against the plaintiffs on all claims. The plaintiffs appealed asserting an additional claim under the Due Process Clause of the Fifth Amendment. We affirm the district court's judgment on all claims, and dismiss the Due Process claim because it is not properly before us.

## II

The plaintiffs' original complaint contended that the EST's disbursement of funds to elder shareholders is illegal as a discriminatory distribution under Alaska corporations law. Sealaska countered that the settlement trust provisions of ANCSA preempt state law in this respect and, therefore, the EST is a valid settlement trust authorized by ANCSA. We affirm the district court's holding that ANCSA displaces contrary state law with respect to settlement trusts, and that the EST is proper under ANCSA.

■ Under the Alaska Corporations Code a corporation must give equal treatment to all shares of the same class and must make its distributions without discrimination. Alaska Stat. § 10.06.305(b). Both parties agree that the EST discriminates against shareholders who have not yet reached age sixty-five. Therefore, if the EST distributions are treated as shareholder dividends, then the payments made through the trust would violate Alaska state law and would be illegal unless authorized by ANCSA.

The district court correctly concluded that ANCSA's provisions *explicitly* preempted state law with respect to corporate resolutions that establish settlement trusts. But the relevant inquiry is not whose law governs the establishment of the trust, but instead whether a state law that prohibits the *actions taken by the trust* is preempted by federal law. Preemption of state law regarding trust distributions is not explicitly covered by the ANCSA settlement trust provisions. Nevertheless, we find that ANCSA implicitly preempts state law in this respect.

Congress provided that conveyance of assets into settlement trusts must be carried out "in accordance with the laws of the State (*except to the extent that such laws are inconsistent with [sections 1629b and 1629e of ANCSA]* )." 43 U.S.C. § 1629e(a)(1)(A) (Supp.1995) (emphasis added). Section 1629e requires that each trust be established "to promote the health, education, and welfare of its beneficiaries and to preserve the heritage and culture of Natives." 43 U.S.C. § 1629e(b)(1). Furthermore, it limits the use of these trusts, specifically prohibiting trusts that "discriminate in favor of a group of individuals composed only or principally of employees, officers, or directors of the settlor Native Corporation." 43 U.S.C. § 1629e(b)(1)(C).

■ According to its plain language, then, ANCSA prohibits settlement trusts that discriminate in favor of corporate insiders, but does not otherwise prohibit trusts that discriminate in favor of other groups of shareholders. This statutory section suggests that ANCSA anticipates that trusts may discriminate in favor of a particular class of shareholders. As a result, a state law that prohibits discriminatory trusts conflicts with ANCSA. When federal and state laws actually conflict, the state law is preempted. *See Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 605, 111 S.Ct. 2476, 2482, 115 L.Ed.2d 532 (1991) ("Such a conflict arises when ... a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' ") (quoting *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

Additionally, the Alaska Corporations Code itself recognizes ANCSA's supremacy when conflicts arise: "a corporation organized under [ANCSA] is governed by [ANCSA] to the extent [ANCSA] is inconsistent with [the Alaska Corporations Code]." Alaska Stat. § 10.06.960(f). Because ANCSA allows trusts that discriminate in favor of some shareholders, and the Alaska Corporations Code proscribes such actions, federal and state law conflict. In such cases, the federal law prevails. Thus, Alaska corporations law abdicates in favor of ANCSA with respect to settlement trust distributions.

Plaintiffs further contend that even if ANCSA does govern establishment of the EST, the EST is a misuse of the settlement trust option for two reasons: (1) because Congress only envisioned the trusts as land protection devices, and (2) because Congress did not intend settlement trusts to confer special benefits on subclasses of Natives. We reject both these arguments and affirm the district court's holding that the EST conforms with the provisions and purpose of ANCSA.

■ First, the argument that the settlement trust was intended only as a method by which corporations could shield *land* from creditors is belied by ANCSA's text and history. The EST, admittedly, does not aim specifically to protect land.[1] But the text of ANCSA imposes no limitation on what can properly be the res of the trust. It allows Native Corporations to convey "assets (including stock or beneficial interests therein) to a Settlement Trust." 43 U.S.C. § 1629e(a)(1)(A). The permissible purposes given in the text do not relate only to interests in land: "The purpose of a Settlement Trust shall be to promote the health, education, and welfare of its beneficiaries and preserve the heritage and culture of Natives." 43 U.S.C. § 1629e(b)(1). Furthermore, ANCSA does specifically proscribe

several purposes,[2] but nowhere does the text of ANCSA's settlement trust option prohibit the purposes espoused by the EST.

■ Second, nothing in the text of the settlement trust provisions prohibits trust distributions to less than all shareholders. In his dissent, Judge Kleinfeld argues that the EST is nothing more than an impermissible "birthday present" to elder shareholders at the expense of those not yet 65 years old. Under his interpretation of the settlement trust option, *any use* of a settlement trust to benefit a subset of shareholders is improper. Such an interpretation of Section 1629e would render the settlement trust option superfluous for any purpose except as a land preservation mechanism. Alaska law and ANCSA already allow regional corporations to distribute dividends to all shareholders equally. Admittedly, the Native corporations could still use settlement trusts to preserve Native land and to protect it from creditors, while making equal distributions to all shareholders through the trust instead of through traditional corporate dividends. But nothing in ANCSA supports such a limited interpretation of the settlement trust provisions.

The legislative history of the 1987 amendments to ANCSA suggests a much more expansive purpose for settlement trusts:

Settlement Trusts are expected to serve *two principal functions*. They are intended to be permanent, Native-oriented institutions which shall hold and manage, in perpetuity, any historic or culturally significant surface lands, sites, cemeteries, traditional use areas, or monuments, for the benefit of the beneficiary population....

The other prime function relates to the health, education and economic welfare of its beneficiaries.... At the discretion of the trustees, [trust assets or income from trust assets] can be used to *provide scholarships* and other educational benefits.

---

1. The purpose of the EST is set forth in a document sent to shareholders entitled "A Shareholder Resolution: An Elders' Settlement Trust:"

    The purpose of the resolution is to provide a benefit to Sealaska elders in recognition of their contribution to Native culture and for the sacrifices they made to fight for and hold on to our lands. The actions of many of these peo-

ple lead to the passage of the Alaska Native Claims Settlement Act (ANCSA).
An additional purpose is to provide health, education and welfare through a one-time cash distribution.

2. For instance, a settlement trust may not operate as a business. 43 U.S.C. § 1629e(b)(1)(A).

Assets can be used to improve health care delivery or facilities, *pay for needed health care* and otherwise be devoted to bettering the health of the beneficiary Native community. Finally, the Trust assets may be used to bolster the economic well-being of the beneficiaries. *Trust distributions may be used to fight poverty, provide food, shelter and clothing, and serve comparable economic welfare purposes.* Additionally, cash distributions of trust income may be made on an across-the-board basis to the beneficiary population as part of the economic welfare function.

133 Cong. Rec. H11,933 (daily ed. Dec. 21, 1987) (House Explanatory Statement), *reprinted in* 1987 U.S.C.C.A.N. 3299, 3307–08 (emphasis added). This description clearly permits across-the-board distributions to all shareholders. But it permits these distributions *in addition* to other anticipated uses of settlement trusts—such as distributions to bolster the economic well-being of individual members of the Native community through scholarships, or provisions for food, shelter, clothing, and needed health care. It is nonsensical to assume that if the shareholders vote to create a settlement trust to provide educational scholarships, that these scholarships must be distributed to every shareholder regardless of whether the shareholder is a student. Also, if a settlement trust is used to "fight poverty," or "provide food, shelter and clothing" then it seems reasonable that distributions will be made based on need, rather than on an across-the-board basis.

In promulgating the 1987 amendments, Congress noted that the corporate structure is not in every instance "well adapted to the reality of life in Native villages and to the continuation of traditional Native cultural values." 43 U.S.C. § 1601 note (Congressional Findings and Declaration of Policy for ANCSA Amendments of 1987) (Supp.1995). Therefore, Congress intended the amendment to "enable the shareholders of each Native Corporation to structure the further

implementation of the settlement in light of their particular circumstances and needs." *Id.* To require that settlement trust distributions be treated in every way like corporate dividends would simply reinforce the corporate structure, and limit the flexibility with which shareholders could structure their settlement.

Both the text and the legislative history support the contention that Congress intended settlement trusts as flexible instruments that would serve a number of purposes besides simply shielding Native land from creditors. Section 1629e gives a broad statement of the permissible purposes for settlement trusts, i.e., to promote the health, education, and welfare of the Native population. Nothing in this section explicitly prohibits distributions to less than all shareholders, except groups composed primarily of corporate insiders.[3] Although, as the dissent suggests, Alaska corporations law could serve to prohibit such distributions, the legislative history of the settlement trust provisions suggests that Congress intended to allow distributions to subsets of shareholders. Therefore, given the broad statement of purpose for settlement trusts, and the further elaboration of this purpose in the legislative history, the most reasonable interpretation of Section 1629e would allow Native corporations to establish settlement trusts to benefit subclasses of shareholders.

Congress placed few limitations on the use of settlement trusts, thus providing Native Corporations the greatest flexibility to structure their settlement to best fit the particular needs of their community. This might be construed to suggest that Native Corporations can use settlement trusts to contravene Alaska corporations law with impunity, and to thereby disadvantage many shareholders.

ANCSA does, however, limit the use of settlement trusts in several ways. It proscribes some trust activities, and defines the specific purposes for which these trusts may

---

**3.** Furthermore, the Congressional findings that accompany the 1987 ANCSA amendments state that "by granting the shareholders of each Native Corporation options to structure the further implementation of the settlement, Congress is not expressing an opinion on the manner in which

such *shareholders choose to balance individual rights and communal rights."* 43 U.S.C. § 1601 note (Supp.1995) (Congressional Findings and Declaration of Policy for ANCSA Amendments of 1987).

be created, i.e., for the health, education, and welfare of the Native community. Although this allows a wide range of applications, to simply quote this language in the preamble of a settlement trust resolution does not by itself confer validity on the proposed trust, as the dissent suggests. Judicial review of these trusts will prevent egregious violations of the settlement trust option, such as those "bizarre transfers" cited by the dissent. For example, these limits would easily preclude a trust that sought merely to discriminate against shareholders who were not members of the majority shareholders' extended family.

Furthermore, ANCSA requires majority or supermajority shareholder approval before corporations may transfer assets to these trusts. 43 U.S.C. § 1629b(d). As with any major corporate decision, shareholder approval does not necessarily guarantee that the outcome is the most prudent course of action. But it does provide some measure of oversight.

Finally, ANCSA specifies that Alaska state law governs settlement trusts in many instances, insofar as the state laws do not conflict with ANCSA. For example, Alaska trust law governs the creation and management of the trust, and Alaska corporations law defines the requirements for proxy solicitation materials, as is discussed in part III below.

These limitations should provide shareholders with sufficient protection with respect to settlement trusts, while also leaving enough flexibility to meet Congress' goals.

In conclusion, the ANCSA settlement trust provisions preempt Alaska Corporations Code with respect to discriminatory settlement trusts. Sealaska's establishment of the EST conforms with the provisions and purpose of the ANCSA settlement trust option. We therefore hold that the EST is a proper use of the settlement trust provisions of ANCSA.

## III

Even if Sealaska properly created the EST as authorized by ANCSA, the plaintiffs argue that shareholder approval of the EST was improper under Alaska corporations law, and that disputed issues of fact render summary judgment improper. We agree with the district court's grant of summary judgment in favor of Sealaska on this issue.

■ First, the plaintiffs contend that the proxy solicitation materials sent to shareholders were misleading and omitted material facts. The 1987 ANCSA amendments make clear that proxy statements and solicitations made in the course of a Native Corporation's efforts to establish a settlement trust must comply with state law. 43 U.S.C. § 1629b (Supp.1995). Alaska law prohibits solicitations and proxy statements that contain material misrepresentations, i.e., statements that are "false or misleading with respect to a material fact [or] omit[ ] a material fact necessary in order to make a statement made in the solicitation not false or misleading." 3 Alaska Admin. Code, tit. 3, § 08.315(a); see also TSC Indus. v. Northway, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (same); Brown v. Ward, 593 P.2d 247, 249–50 (Alaska 1979) (although the letter of federal proxy rules does not apply to ANCSA corporations, the spirit does).

The plaintiffs assert a variety of claims that material facts were not disclosed or were concealed in the proxy materials. For example, they claim that Sealaska omitted a material fact by expressing the cost of the EST as a lump sum of about $6 million rather than as cost per share. The district court found, however, and we agree, that the proxy solicitation materials comported with Alaska law, and that plaintiffs failed to raise genuine issues of fact as to whether they were misleading or omitted material facts.

■ Second, plaintiffs assert that shareholder approval of the EST resolution is invalid because nonvoting shares were not allowed to vote on the proposal. ANCSA provides that shares held by non-Natives that were acquired through inheritance do not carry voting rights. 43 U.S.C. § 1606(h)(2)(C) (Supp.1995). Then, it specifically conditions approval of a settlement trust upon majority vote of "the total voting power of the corporation," defined as "all

outstanding shares of stock that *carry voting rights.*" 43 U.S.C. §§ 1629b(d)(1)(A) and 1629b(e) (emphasis added). Thus, ANCSA itself provides that nonvoting shares have no right to vote on corporate resolutions establishing settlement trusts.

The plaintiffs seek to avoid this conclusion by arguing that under state law, nonvoting shares *do* get to vote on certain fundamental corporate changes. This argument fails, however, because, as discussed previously, section 1629b expressly states that corporate resolutions to establish a settlement trust shall be governed by the provisions of ANCSA, "[n]otwithstanding any provision ... of the laws of the State." 43 U.S.C. § 1629b(a). Thus, the nonvoting shares were properly denied the right to vote on the EST resolution.

Given the foregoing, we reject plaintiffs' claim that shareholder approval of the EST resolution was invalid and affirm the district court's grant of summary judgment on this claim.

### IV

The plaintiffs' final argument is that section 1629e of ANCSA is unconstitutional as applied to them for two reasons: first, allowing creation of the EST impairs the shareholders' "contract" rights under the articles of incorporation, and thus, section 1629e violates the Due Process Clause of the Fifth Amendment; second, because it authorizes Sealaska to transfer $6 million of its corporate equity to the EST, section 1629e permits a "taking" of the disadvantaged shareholders' property in violation of the Fifth Amendment.

■ Plaintiffs assert their due process claim for the first time on appeal. Generally, an appellate court will not hear an issue raised for the first time on appeal. *Golden Gate Hotel Ass'n v. City and County of San Francisco,* 18 F.3d 1482, 1487 (9th Cir.1994) (citing *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976)). To have been properly raised below, "the argument must be raised sufficiently for the

trial court to rule on it." *In re E.R. Fegert, Inc.,* 887 F.2d 955, 957 (9th Cir.1989). Because this issue was not raised below, we decline to reach the merits.

■ As to the takings claim, we agree with the district court that, as a matter of law, the claim fails. However, we do not agree with the district court's reasoning on this issue.

The district court began its analysis "with the assumption that the use of corporate assets to create the EST amounted to a taking of the non-voting shareholders [sic] equity in the corporation for which no compensation was provided." We question the validity of this assumption. The property interest plaintiffs seek to protect is the value of their Sealaska stock.[4] But takings cases almost universally involve governmental action that affects ownership rights in *real property,* and plaintiffs cite no case authority for their claim that the Takings Clause protects their interest in Sealaska's corporate equity.

Furthermore, corporate shareholders do not directly own any part of a corporation's property or assets. They only own shares of stock, which represent a proportionate interest in the corporate equity remaining after a corporation meets all its other debts and obligations. The profits themselves belong to the corporation, and do not pass to the shareholders unless and until the board of directors declares a dividend. Thus, the plaintiff shareholders have no proprietary interest that could have been "taken."

■ Nevertheless, even if we accept the premise that plaintiffs' interest in Sealaska's corporate equity may be the subject of a takings claim, the claim still fails for lack of sufficient government action. Takings jurisprudence encompasses two lines of authority: physical occupation cases, and regulatory takings cases. *Compare Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (holding that New York law *requiring* landlords to allow cable television companies to

---

4. Plaintiffs claim that by transferring corporate assets to the EST—$6 million worth—Sealaska decreased its corporate equity, thus decreasing the value of its stock.

install cables in their buildings constituted a physical intrusion sufficient to be a taking) *with Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798 (1992) (indicating that when a government land use regulation forces the owner of real property "to sacrifice *all* economically beneficial uses [of his property,] he has suffered a taking"). Plaintiffs allege no physical invasion of property, so their claim must fall into the regulatory taking category.

■ Regulatory takings generally require some government regulation or other government action that compels the owner to sacrifice all economically viable use of his or her property. *E.g., Lucas,* 505 U.S. 1003, 112 S.Ct. 2886 (the state's coastal preservation statute prevented the landowner from building any structure on his property). In this case, Sealaska was not in any way compelled by the federal government to create the EST. The settlement trust option is just that—an option. That Sealaska's action was authorized by federal law does not transmute it into government action sufficient for the Fifth Amendment. Without governmental encouragement or coercion, actions taken by private corporations pursuant to federal law do not transmute into government action under the Fifth Amendment. *See, e.g., Fidelity Financial Corp. v. Federal Home Loan Bank,* 792 F.2d 1432, 1435 (9th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987) (finding no government action in a bank's loan decision even though the bank was created by a federal agency to accomplish federal objectives, was subject to extensive federal regulation, and some of the bank's directors and managers were appointed by a federal bank board). *But see Ginn v. Mathews,* 533 F.2d 477, 480 (9th Cir.1976) (finding governmental action in an employment decision made by the Economic Opportunity Council of San Francisco, but empha-

sizing that the Council was operating with almost exclusively federal funds); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (finding government action largely on the basis that the defendant, a private lessee, received significant financial support from the parking authority). Even in cases in which the court found government action, it often reiterated the general principle that "[w]here the action taken is entirely by a private corporation with no overriding or pervasive [government] involvement, the provisions of the First, Fifth, and Fourteenth Amendments impose no limitations upon that action." *Ginn,* 533 F.2d at 479.

■ In this case, Sealaska is a private corporation that established the EST using private funds. The operation of the trust is not subject to governmental oversight. Furthermore, Sealaska was neither encouraged nor coerced into creating the EST by the federal government. It merely exercised its option under ANCSA to transfer its assets to a settlement trust. We therefore affirm the grant of summary judgment in favor of Sealaska on the plaintiffs' takings claim.[5]

## V

Through instruments like the settlement trust, Congress sought to expand the ability of Native Corporation shareholders to "structure the further implementation of the settlement in light of their particular circumstances and needs." 43 U.S.C. § 1601 note (Supp.1995) (Congressional Findings and Declaration of Policy for ANCSA Amendments of 1987). Sealaska did just that, establishing its Elders' Settlement Trust to address concerns related to the welfare of its elder shareholders. We conclude that Sealaska's Elders' Settlement Trust is a legitimate use of the settlement trust option as

---

5. The district court ultimately concluded that the takings claim failed because the distribution of funds to elder shareholders was for a private use, and not a public use within the purview of the Fifth Amendment. The district court failed to see that takings for a private use, as opposed to a public use, are presumptively unconstitutional. *See, e.g., Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 241, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984) ("[T]he Court's cases have repeatedly stated that 'one person's property may not be taken for the benefit of another private person without a public purpose, even though compensation be paid.' ") (quoting *Thompson v. Consolidated Gas Utilities Corp.,* 300 U.S. 55, 80, 57 S.Ct. 364, 376, 81 L.Ed. 510 (1937)). Therefore, the district court erred when it held that because this alleged taking was for a *private use* it did not violate the plaintiffs' Fifth Amendment rights.

authorized by ANCSA, and that such use comports with the plain language and the purpose of the ANCSA amendments. The district court's order granting summary judgment in favor of Sealaska on all claims is AFFIRMED.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

Sealaska, organized as a business corporation, decided to give each shareholder a $2,000 birthday present at age 65. That discriminates by age, because at the time of the decision, not all the shareholders were 65. Several directors would immediately or soon receive this substantial gift. Many shareholders would not receive the gift for decades. The present value of the gift, assuming a 5% interest rate, is $2,000 to a 65 year old director, $284 to a 25 year old shareholder.

This discriminatory cash gift to shareholders, as the majority acknowledges, would violate Alaska corporation law, if federal law does not provide otherwise. Under the Alaska Corporations Code, all Alaska corporations must treat all shares in the same class equally with respect to dividends and other rights. Alaska Stat. §§ 10.06.542, 10.06.305(b).

The preemption analysis used in the majority opinion is mistaken, because any preemption is illusory. There cannot be federal preemption of state law in this case, because there cannot be any conflict between the two laws. The state law says that a native corporation can do anything ANCSA permits. AS 10.06.960(f). That means there can be nothing which ANCSA permits but state law prohibits, so there can be no conflicting state law to preempt. ANCSA says that a conveyance to a settlement trust should be in accord with Alaska law except to the extent that state law is inconsistent with ANCSA. 43 U.S.C. § 1629e(a)(1)(A). That means that there can be no preemption of the field. If federal law permits the particular discriminatory cash transfer through the settlement trust, state law does too, and if not, not.

The majority opinion says that "[a]ccording to its plain language, then, ANCSA pro-

hibits settlement trusts that discriminate in favor of corporate insiders, but does not prohibit trusts that discriminate in favor of other groups of shareholders." Maj. op. at 426. The "plain language" consists only of the prohibition. The non-prohibition described in that sentence is an inference from silence, not an expression by Congress in plain language. The provision which provides the basis for the majority's conclusion states only what is prohibited, not what is permitted:

> The purpose of a Settlement Trust shall be to promote the health, education, and welfare of its beneficiaries and preserve the heritage and culture of Natives. A Settlement Trust *shall not—*
>
> (A) operate as a business;
>
> (B) alienate land or any interest in land received from the settlor Native Corporation (except if the recipient of the land is the settlor corporation); or
>
> (C) discriminate in favor of a group of individuals composed only or principally of employees, officers, or directors of the settlor Native Corporation.
>
> An alienation of land or an interest in land in violation of this paragraph shall be void ab initio and shall not be given effect by any court.

43 U.S.C. § 1629e(b)(1) (emphasis added). The majority reasons that because the statute prohibits trusts that discriminate in favor of employees, officers, and directors, "but does not otherwise prohibit trusts that discriminate in favor of other groups of shareholders[,][t]his statutory section suggests that ANCSA anticipates that trusts may discriminate in favor of a particular class of shareholders." Maj. op. at 426.

This method of reasoning, inferring from the explicit prohibition of one form of discrimination the implicit authorization of all other forms, is a traditional application of the maxim, *expressio unius est exclusio alterius.* Quoting the maxim is less fashionable than it used to be before Karl Llewellyn's famous attack. *See* Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed,* 3 Vand.L.Rev. 395, 401–406 (1950), *as reproduced in,* Karl N. Llewellyn, *The Common Law Tradition: Deciding Ap-*

*peals* App. C, 521–35 (1960). But the logic of the maxim, that listing several specific things implies an intention to exclude others, is the only way to get from a statutory prohibition of some conduct to implied permission for other conduct. This is how the majority gets from the "shall not" in the statute to the majority's statement that "ANCSA anticipates that trusts may discriminate in favor of a particular class of shareholders."

The *expressio unius* analysis is often correct, but not always. It does not make sense here. Anytime a statute contains a list, the question arises whether the list exhausts all the things the legislature intended to permit or prohibit. The inference that a list excludes things not on the list does not relieve us of our duty to make sense of the statute:

> Most strongly put, the *expressio unius,* or *inclusio unius* principle is that '[w]hen a statute limits a things to be done in a particular mode, it includes a negative of any other mode.' *Raleigh & Gaston Ry. Co. v. Reid,* 80 U.S. (13 Wall.) 269, 270, 20 L.Ed 570 (1871). This is a rule of interpretation, not a rule of law. The maxim is 'a product of logic and common sense,' properly applied only when it makes sense as a matter of legislative purpose. *Alcaraz v. Block,* 746 F.2d 593, 607–08 (9th Cir.1984). Like the principle of construing a modifying clause to modify only the closer antecedent, the *expressio unius* principle describes what we usually mean by a particular manner of expression, but does not prescribe how we must interpret a phrase once written. Understood as a descriptive generalization about language rather than a prescriptive rule of construction, the maxim usefully describes a common syntactical implication. 'My children are Jonathan, Rebecca and Seth' means 'none of my children are Samuel.' Sometimes there is no negative pregnant: 'get milk, bread, peanut butter and eggs at the grocery' probably does not mean 'do not get ice cream.'

*Longview Fibre Co. v. Rasmussen,* 980 F.2d 1307, 1312–13 (9th Cir.1992).

It does not make sense to suppose that Congress meant, by the list in § 1629e(b)(1), to permit any kind of discriminat[ion], except "discriminat[ion] in favor of ... employees, officers, or directors." Consider, by analogy, that Congress in the Americans With Disabilities Act said "[n]o covered entity shall discriminate against a qualified individual with a disability." 42 U.S.C. § 12112. The ADA does not by that prohibition imply that discrimination by reason of age, sex, and race are permissible. The provision prohibits one kind of discrimination, and leaves it to other federal and state laws to prohibit others. That is the sensible way to read the prohibition in the statute before us.

This makes sense as a Congressional purpose. Congress might have felt that there were special risks to Native corporations that they would be taken advantage of by employees, officers and directors through the Settlement Trust mechanism, unique to Native Corporations, so more protection of shareholders from this device was needed than for ordinary business corporations, but felt that for other risks, state law protections were adequate. One of the virtues of the Alaska Native Claims Settlement Act was the creation of a large number of Alaska Native leaders experienced in business as well as politics, and employment opportunities in towns and villages where there had previously been little work for money wages. But this virtue could become a vice if the corporations were operated for the benefit of their employees, who might not be natives or shareholders, instead of for all the Natives who owned stock and would inherit stock.

Virtually any transfer of corporate assets could be provided for in a resolution which, in its preamble, said that the transfer was to "promote the ... welfare of its beneficiaries," and, so long as the recipients were Alaska Natives, to "preserve the heritage and culture of Natives." Unless someone thinks of a distinction in some future case, the majority holding implies that Congress meant to permit some bizarre transfers of Native corporation assets. For example, a Native corporation might decide that a particular candidate for office was likely to promote the health, education, and welfare of Alaska Natives better than competing candidates, and that Native culture would best be preserved by using a trust to pay $2,000 to

each Native who signed an affidavit that he or she had voted for the named candidate. Quite a few Alaska native villages have fewer than 100 people, and many have under 300. *See The Alaska Almanac: Facts About Alaska 17th Edition* 130–31, 147–53 (Carolyn Smith ed.) (1993). Village Corporations may create settlement trusts under ANCSA. 43 U.S.C. §§ 1602 (defines "Native Corporation" to include "Village Corporation") & 1629e (permits any Native Corporation to create a settlement trust). Under the majority construction of the statute, a village corporation, a majority of whose shareholders were linked by blood or property to a large extended family, might decide that Native culture was best preserved by funneling the assets through a settlement trust out to their family and not the other families in the village.

The majority says that "[j]udicial review of these trusts will prevent egregious violations of the settlement trust option, such as [these] 'bizarre transfers.'" But it does not say how. The majority opinion establishes that the federal law preempts state law, and "does not otherwise prohibit trusts that discriminate in favor of other groups of shareholders," and "trusts may discriminate in favor of a particular class of shareholders." Maj. op. at 426. I hope that subsequent panels distinguish the case at bar if "bizarre transfers" through settlement trusts are made, but I do not see a basis, in the majority's *ratio decidendi,* for making a distinction.

In any corporation, Native or not, people with more power than others may try to translate their power into money. It is unlikely that Congress meant to deprive Native corporation shareholders of all the protections state corporation law generally gives to shareholders against discriminatory distributions of corporate assets. Yet the hypothetical forms of discrimination described above would not be "in favor of a group of individuals composed only or principally of employees, officers, or directors," so under the majority holding, any state law prohibiting such discrimination would be preempted. None of this seems likely to have been the intent of Congress, because it does not make any practical sense.

If we are to apply the *expressio unius* principle to anything, it should be to the statutory provision speaking directly to how to enhance benefits to elders. There is a special provision for issuance of up to 100 additional shares of regional corporation stock to natives who have attained the age of 65:

A Regional Corporation may amend its articles of incorporation to authorize the issuance of additional shares of Settlement Common Stock to—

. . .

(III) Natives who have attained the age of 65, for no consideration or for such consideration and upon such terms and conditions as may be specified in such amendment or in a resolution approved by the board of directors pursuant to authority expressly vested in the board by the amendment. The amendment to the articles of incorporation may specify which class of Settlement Common Stock shall be issued to the various groups of Natives.

43 U.S.C. § 1606(g)(1)(B)(i).

The *expressio unius* inference, as applied to this section, implies that Congress intended that discrimination in favor of elders would take place only through regional corporations, not village corporations, and exclusively through amendments to the articles of incorporation issuing more stock to elders (which may, in turn, yield more dividends). *See* 43 U.S.C. § 1606(g)(1)(B)(iv) (common stock issued to elders as the result of a special amendments shall not have rights to certain distributions unless a majority of shareholders specially grant such rights). Accordingly, we could assume that Congress intended to leave in place state prohibitions against other forms of discrimination in favor of elders.

One use of settlement trusts is to preserve native corporation assets from creditors, *see* 43 U.S.C. § 1629e(c)(5), and from the consequences of accidental corporate dissolution. The statute states the purpose of settlement trusts, "to promote the health, education, and welfare of its beneficiaries and preserve the heritage and culture of Natives." 43 U.S.C. § 1629e(b)(1). Most corporations cannot op-

erate for such purposes, so excluding discriminatory dividends from the purposes does not strip the statute of practical effect. We need not decide whether the statements in the legislative history, such as that settlement trusts can be used to award scholarships to individuals, are correct. Perhaps such scholarship programs are permissible, so long as the criteria for the scholarship awards are nondiscriminatory. Or perhaps this snippet of legislative history was a consolation prize to someone who did not get what he or she wanted in the statute. We should not assume the answer to one difficult question not before us in order to resolve another.

The majority relies too heavily, in my view, on the "House Explanatory Statement." Maj. op. at 428. We should construe the statute, not the legislative history. *See* Kenneth W. Starr, *Observations About the Use of Legislative History,* 1987 Duke L.J. 371 (1987). Reliance on legislative history is often the "equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff,* 507 U.S. 511, 519, 113 S.Ct. 1562, 1567, 123 L.Ed.2d 229 (1993) (Scalia, J. concurring). The majority infers from the statement in the House Explanatory Statement that if scholarships are permissible, then so are birthday presents. A stronger inference would be that if "distributions of trust income may be made on an across-the board basis," House Explanatory Statement, 133 Cong. Rec. H11,933, (daily ed. Dec. 21, 1987), *reprinted in,* 1987 U.S.C.C.A.N. 3299, 3308, then they cannot be made on a discriminatory basis.

In sum, the statute says some types of discrimination are prohibited, and also says that Native corporations can provide for issuance of additional shares of stock to elders. The majority reads a negative pregnant into the discrimination section but not the elders section. I do not see why the first inference is any stronger than the second, and see good reason for the contrary view. The majority infers from the statement about scholarships in the legislative history that discriminatory distributions are permitted, but draws no inference that they are prohibited from the "across-the-board" language about distributions in the same paragraph. We must necessarily exercise judgment on difficult questions to decide the extent to which the statute exposes Native shareholders to discriminatory distributions of corporate assets. I believe Congress left in place more of the state law protection generally applicable to corporate shareholders than the majority does.