Robert MALABED, Plaintiff–Appellee,

v.

NORTH SLOPE BOROUGH, Defendant–Appellant.

Morris David Welch, Plaintiff–Appellee,

v.

North Slope Borough, Defendant–
Appellant.

Charles Michael Emerson,
Plaintiff–Appellee,

v.

North Slope Borough, Defendant–
Appellant.

Nos. 99–35684, 99–35750, 99–35773.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 6, 2000.

Certified to Alaska Supreme
Court July 28, 2000.

Submission Vacated March 27, 2001.

Certified Question Decided by Alaska
Supreme Court May 16, 2003.

Resubmitted June 19, 2003.

Filed July 8, 2003.

David C. Crosby, Wickwire, Greene, Crosby, Brewer & Seward, Juneau, AK, for defendant-appellant.

William B. Schendel, Schendel & Callahan, Fairbanks, AK; Kenneth L. Covell, Law Offices of Kenneth L. Covell, Fairbanks, AK, for plaintiffs-appellees.

Robert J. Gregory, Senior Attorney, Equal Employment Opportunity Commission, Washington, D.C., for amicus curiae Equal Employment Opportunity Commission.

David S. Case, Copeland, Landye, Bennett and Wolf, LLP, Anchorage, AK, for amicus curiae Alaska Federation of Natives.

Before BROWNING, B. FLETCHER, and GOULD, Circuit Judges.

## OPINION

GOULD, Circuit Judge.

The North Slope Borough appeals the order of the district court enjoining it from enforcing a local ordinance that gives a preference in Borough employment to members of federally recognized Indian tribes. We certified a question to the Alaska Supreme Court asking whether the North Slope Borough ordinance violates local law, state statutory law, or the Alaska Constitution. We have received a response and conclude that the ordinance violates the Alaska Constitution's guarantee of equal protection.

### I

The North Slope Borough is a political subdivision of the State of Alaska. In 1997, the Borough Assembly enacted an ordinance (the Ordinance) granting an employment preference to Native Americans, defined as members of federally recognized Indian tribes:

> *The granting of employment preference to Native Americans.* The preference shall apply to hirings, promotions, transfers, and reinstatements. A Native American applicant who meets the minimum qualifications for a position shall be selected, and where there is more than one Native American applicant who meets the minimum qualifications for a position, the best qualified among these shall be selected. A Native American is a person belonging to an Indian tribe as defined in 25 U.S.C. Section 3703(10).

North Slope Borough Code § 2.20.150(A)(27).[1] Plaintiffs/Appellees

---

1. On March 3, 1998, the Ordinance was amended to create a preference not only for qualified Native Americans, but also for Native Americans who failed to meet the minimum qualifications for a job at the time of their hiring, but who could do so within a set amount of time after hiring. Appellees Malabed and Emerson were denied employment under the original ordinance; appellee Welch was denied employment under the amended ordinance. These differences between the

are not Native Americans and claim that they were denied employment with the Borough because of the Ordinance. Robert Malabed is an Asian–American of Filipino descent. He worked as a temporary security guard for the Borough for several years until his application for permanent employment was rejected in 1998, about a year after the Borough enacted the Ordinance, and he was replaced by a Native American. Morris David Welch is a Caucasian who worked as a water plant operator for the Borough since 1989. In 1998, he applied for a promotion, but was rejected in favor of a Native American. Charles Michael Emerson is a Caucasian who worked in various positions for the Borough since 1991. In 1998, he applied for a job with the Borough's housing department, but was rejected in favor of a Native American.

Malabed, Welch, and Emerson sued the Borough, contending, *inter alia,* that the Borough rejected their job applications in favor of less qualified individuals, and that the Ordinance impermissibly discriminates on the basis of race, national origin, and political affiliation, in violation of several state and local laws, including the Borough's charter, Alaska Stat. §§ 18.80.220(a) & 29.20.630, and the Alaska Constitution, Art. I, § 3. They also argued that the Ordinance violated the

Equal Protection Clauses of both the Alaska Constitution (Art. I, § 1) and the Fourteenth Amendment to the United States Constitution.

The district court held that the Ordinance discriminates on the basis of national origin in violation of the Borough's Charter, and that the Ordinance violated the Equal Protection Clause of the Fourteenth Amendment.[2] The court declared the Ordinance invalid, and enjoined the Borough from relying on it. This appeal followed.

■ We review de novo the legal conclusions underlying a district court's grant of a permanent injunction, and we review its factual findings for clear error. *See Walters v. Reno,* 145 F.3d 1032, 1047 (9th Cir.1998). We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## II

■ Because we thought that the question of the legality of the Borough ordinance under Alaska law might be determinative of this appeal, and because it appeared to us that there was no controlling precedent in the decisions of the Alaska Supreme Court, we certified the following question to the Alaska Supreme Court:[3]

---

amended ordinance and the original ordinance are not material to our analysis.

**2.** Because the Ordinance violates the Equal Protection Clause of the Alaska Constitution, we do not reach the issues decided by the district court—whether the Ordinance discriminates on the basis of national origin under the Borough's Charter, and whether the Ordinance violates the Federal Constitution. *See Siler v. Louisville & Nashville R.R. Co.,* 213 U.S. 175, 193, 29 S.Ct. 451, 53 L.Ed. 753 (1909) ("Where a case ... can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without

important reasons."); *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1391–92 (9th Cir.1994) ("It is well-established that we should avoid adjudication of federal constitutional claims when alternative state grounds are available.").

**3.** We certified this question to the Alaska Supreme Court because the case presented important and unsettled issues of state law. *See Arizonans for Official English v. Arizona,* 520 U.S. 43, 76, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) ("Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save 'time, energy, and resources

Is North Slope Borough Code § 2.20.150(A)(27), granting employment preferences to Native Americans in borough hiring, impermissible under local law, state statutory law, or the Alaska Constitution?

The Alaska Supreme Court granted certification and held "that the borough's hiring preference violates the Alaska Constitution's guarantee of equal protection[4] because the borough lacks a legitimate governmental interest to enact a hiring preference favoring one class of citizens at the expense of others and because the preference it enacted is not closely tailored to meet its goals." *Malabed v. North Slope Borough,* 70 P.3d 416, 427 (Alaska 2003). After considering the response of the Alaska Supreme Court, we conclude that the Ordinance is invalid under the Alaska Constitution.[5] *See In re Kirkland,* 915 F.2d 1236, 1238 (9th Cir. 1990) ("When interpreting state law, a federal court is bound by the decision of the highest state court."). Because the ordinance is invalid under the Alaska Constitution, we do not reach appellees' federal constitutional claims. *See Vernon v. City of Los Angeles,* 27 F.3d 1385, 1391–92 (9th Cir.1994) ("It is well-established that we should avoid adjudication of federal constitutional claims when alternative state grounds are available.").

### III

The Borough contends that § 703(i) of the Civil Rights Act of 1964 preempts Alaska constitutional or other law that prohibits discrimination in employment preferences affirmatively favoring Native Americans over others. Section 703(i) provides:

Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential

---

and hel[p] build a cooperative judicial federalism.' "). We appreciate the careful attention that the Alaska Supreme Court gave to the question certified and its clear response.

**4.** The equal protection clause of the Alaska Constitution, Article I, section 1, provides:

This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

Alaska Const. art I, § 1.

**5.** The Borough attempts to avoid this conclusion by arguing that its preference operates in favor of members of Indian tribes. Relying on *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Borough argues that statutes enacted for the benefit of tribal members do not violate *any* federal or state antidiscrimination law, including Article

I, Section 1 of the Alaska Constitution. This argument puts more weight on *Mancari* than it can bear. *Mancari* held only that when Congress acts to fulfill its unique trust responsibilities toward Indian tribes, such legislation is not based on a suspect classification. *See id.* at 554 n. 24, 94 S.Ct. 2474. Indeed, in its more recent case of *Rice v. Cayetano,* 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000), the Supreme Court expressly stated that the *Mancari* "opinion was careful to note ... that the case was confined to the authority of the BIA, an agency described as 'sui generis.' " *Id.* at 520, 120 S.Ct. 1044 (citing *Mancari,* 417 U.S. at 554, 94 S.Ct. 2474). *See also Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.,* 154 F.3d 1117, 1120 (9th Cir.1998) ("[*Mancari* ] simply held that the employment preference at issue, though based on a racial classification, did not violate the Due Process clause because there was a legitimate non-racial purpose underlying the preference: the unique interest the Bureau of Indian Affairs had in employing Native Americans, or more generally, Native Americans' interests in self-governance—interests not present in this case.")

treatment is given to any individual because he is an Indian living on or near a reservation.

42 U.S.C. § 2000e–2(i).

A

■ In determining whether a federal statute preempts state law, our "sole task is to ascertain the intent of Congress." *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) (plurality opinion); *see also Coalition for Econ. Equity v. Wilson*, 122 F.3d 692, 710 (9th Cir.1997) (expressly following *Guerra*, and finding no preemption where "Title VII by its plain language does not preempt" a state law). We must begin with the presumption that Congress did not intend to preempt state law.[6] *See New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). If we have any doubt about congressional intent, we are to err on the side of caution, finding no preemption, "[f]or the state is powerless to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the burden." *Beveridge v. Lewis*, 939 F.2d 859, 863 (9th Cir.1991) (quoting *Penn Dairies v. Milk Control Comm'n*, 318 U.S. 261, 275, 63 S.Ct. 617, 87 L.Ed. 748 (1943)). "Congressional intent to preempt state law must be clear and manifest." *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1150 (9th Cir.2000) (quotations omitted).

In *National Warranty Ins. Co. RRG v. Greenfield*, 214 F.3d 1073 (9th Cir.2000), we considered the scope of federal preemption of state laws regulating a type of liability insurer. In so doing, we emphasized that Congressional purpose is the "touchstone" for preemption analysis:

So long as it acts within the scope of its enumerated powers, Congress may preempt inconsistent state law. *See Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1263 (9th Cir.1996). There is no question in this case whether Congress may preempt Oregon law; the question, rather, is whether Congress has done so. "In determining whether federal law preempts a state statute, we look to congressional intent. Preemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *FMC Corp. v. Holliday*, 498 U.S. 52, 56–57, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990) (internal quotations omitted). A federal statute may preempt state law by express statement, by occupying a field, or by conflicting with state law. *Industrial Truck Ass'n, Inc. v. Henry*, 125 F.3d 1305, 1309 (9th Cir.1997).

There are two presumptions underlying any preemption analysis. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). First, the states are independent sovereigns in our federal system, and preemption will not be easily found. "In all preemption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of

---

**6.** Although more liberal rules govern preemption analysis with respect to laws that pertain to Indian country or Indians in Indian country, standard preemption analysis applies with respect to nondiscriminatory laws of general applicability that may affect Indians outside of Indian country, as is the case here. *See Blunk v. Ariz. Dep't. of Transp.*, 177 F.3d 879, 882 (9th Cir.1999).

Congress.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Second, the "analysis of the scope of the statute's preemption is guided by [the] oft-repeated comment ... that the purpose of Congress is the ultimate touchstone in every preemption case." *Id.* (quotations omitted).

*Id.* at 1076–77.

■ Certainly there can be no valid argument that Congress has preempted state law here either by express statement or by occupying a field. Congress did not recite an intent to preempt state laws forbidding discrimination, nor has it occupied the field in a way that prohibits states from outlawing discrimination. Thus, the issue before us narrows to whether preemption may occur on the theory that § 703(i) is in conflict with state law. *See id.; Industrial Truck Ass'n, Inc. v. Henry,* 125 F.3d 1305, 1309 (9th Cir.1997).

More specifically, because the Civil Rights Act of 1964 contains preemption provisions that provide a "reliable indicium of congressional intent with respect to state authority," we look to those provisions to determine whether state law conflicts with federal law in a manner that requires preemption. *Guerra,* 479 U.S. at 282, 107 S.Ct. 683 (internal quotations omitted); *see also Coalition for Econ. Equity,* 122 F.3d at 709–10.

### B

The Civil Rights Act of 1964 contains two such express provisions. *See Guerra,* 479 U.S. at 281–82, 107 S.Ct. 683. Section 708 of Title VII provides:

Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter.

42 U.S.C. § 2000e–7. Section 1104 of Title XI applies to all titles of the Civil Rights Act, including Title VII. *See Guerra,* 479 U.S. at 282, 107 S.Ct. 683. It provides:

Nothing contained in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such title operates to the exclusion of State laws on the same subject matter, nor shall any provision of this Act be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this Act, or any provision thereof.

42 U.S.C. § 2000h–4.

These provisions are narrow. As the Supreme Court explained in *Guerra,*

"Sections 708 and 1104 severely limit Title VII's pre-emptive effect. Instead of pre-empting state fair employment laws, § 708 left them where they were before the enactment of title VII. Similarly, § 1104 was intended primarily to assert the intention of Congress to preserve existing civil rights laws. The narrow scope of pre-emption available under §§ 708 and 1104 reflects the importance Congress attached to state antidiscrimination laws in achieving Title VII's goal of equal employment opportunity."

479 U.S. at 282–83, 107 S.Ct. 683 (citations and quotations omitted).

Section 708 provides no support for the Borough. It would provide exemption from a state law that required or permitted acts that would be unlawful employment practices under Title VII. The Alaska Constitution's equal protection clause, here prohibiting the Borough's employ-

ment preference, does not "require or permit the doing of any act which would be an unlawful employment practice" under Title VII. Section 708 does not apply.

Section 1104 permits a finding of preemption only if the Alaska Constitution's equal protection clause, here prohibiting the challenged employment preferences, is inconsistent with the purpose of Title VII or with § 703(i). Alaska's bar against employment preferences is not inconsistent with the purpose of Title VII, which is to "achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

The Borough argues, however, that § 703(i) "established a national Indian policy of encouraging private and public employers to address high Native American unemployment rates," and "authorized" the Borough to give hiring preferences to Native Americans. Thus, the Borough contends, state laws that prohibit it from giving those hiring preferences are inconsistent with § 703(i), and are preempted.

The plain language of § 703(i) does not support the Borough's position. The section does no more than limit the scope of Title VII, the operative words being: "Nothing contained in this subchapter shall apply ...." Section 703(i) does not require employers to implement Native American employment preference programs. It does not state that employers may implement such programs without regard to any local, state, or federal law. It does not provide an incentive to give such preferences. In summary, it does not create or authorize a preference program.

Rather, it creates an exception to the reach of Title VII for *otherwise* valid programs.

It is true, as the Borough recites, that "statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (internal quotations omitted). But even if this principle can be applied in a preemption analysis, there are no doubtful expressions in § 703(i). The *Bryan* rule does not license courts to rely on ambiguities that do not exist. *See South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). "[W]e cannot, under the guise of interpretation, ... rewrite congressional acts...." *Confederated Bands of Ute Indians v. United States,* 330 U.S. 169, 179, 67 S.Ct. 650, 91 L.Ed. 823 (1947).

The legislative history of § 703(i) is consistent with our conclusion. It reveals that the primary impetus behind § 703(i) was concern that by enacting Title VII Congress would render unlawful otherwise permissible hiring preferences for Native Americans. Several tribes wrote to Congress stating that they would support passage of the Civil Rights Act only if § 703(i) was made a part of it. *See* 110 Cong. Rec. 13702(Senate, June 13, 1964).[7] Similarly, the section's author, Senator Mundt, told the Senate that the purpose of § 703(i) was to protect existing or future preference programs. He did not indicate, contrary to the Borough's contention, that § 703(i) established such a program:

> [Section 703(i)] will assure our American Indians of the *continued* right to

---

7. *E.g.,* "With these amendments, we would fully endorse the principle of the Civil Rights Act of 1964." *Id.* "The Fort Totten Sioux endorses the Civil Rights Act of 1963, provided that the Indian amendment[s] ... are made a part of the act." *Id.*

protect and promote their own interests and to benefit from Indian preference programs *now in operation or later to be instituted.*

*Id.* (emphasis added).

The Equal Opportunity Employment Commission ("EEOC"), as amicus, argues that even if there is no direct conflict between § 703(i) and Alaska's equal protection guarantees, the general federal policy of promoting economic opportunities for Native Americans preempts a state constitutional prohibition of hiring preferences favoring Native Americans. The parties themselves, however, appear to disagree, insofar as they correctly acknowledge that in this case such a generalized policy is insufficient to preempt state law. *See* Appellant's Supp. Memo. 15; Supp. Brf. of Appellees 3–4. In any event, whatever the contentions of the parties and amicus, the Supreme Court has unmistakably held that nondiscriminatory state laws that apply to Native Americans outside of Indian country may be preempted only by an "express federal law to the contrary," not by a generalized federal policy. *White Mtn. Apache Tribe v. Bracker,* 448 U.S. 136, 144 n. 11, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (quotations omitted); *see also Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *Tunica–Biloxi Tribe v. Louisiana,* 964 F.2d 1536, 1542 (5th Cir.1992). The North Slope Borough is not in Indian country. *See Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998). And, as discussed above, § 703(i) is not an express federal law that is contrary to the Alaska constitutional provision at issue.[8]

■ The existence of express preference programs created by Congress supports our conclusion. They highlight § 703(i)'s limited reach and limited purpose, for they show that when Congress wants to authorize or require Native hiring preferences, it knows how to do so. The Indian Self–Determination and Education Assistance Act, 25 U.S.C. § 450e(b), for example, is unequivocal:

> Any contract, subcontract, grant, or subgrant pursuant to this [Act] ... or any other Act authorizing Federal contracts with or grants to Indian organizations or for the benefit of Indians, shall require that to the greatest extent feasible—
>
> (1) preferences and opportunities for training and employment in connection with the administration of such contracts or grants shall be given Indians;

Section 703(i) is different. In contrast to the language of statutes and regulations that authorize preference programs, § 703(i) provides only that such preference programs are exempt from the reach of Title VII.

■ This conclusion is dispositive. It is the rule that exceptions to broad prohibitory statutes generally have no preemptive effect. As we have cautioned, "A finding of preemption is particularly inappropriate when the state is regulating conduct permitted by federal regulation, but only as an exception to a broad federal prohibition." *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 498 (9th Cir.1984). The Supreme Court has reasoned that a finding of preemption in this context is not only "inappropriate," but "illogical." *Exx-*

---

**8.** The cases on which the EEOC relies do not dictate a different conclusion. In fact, they illustrate the rule. *Warren Trading Post Co. v. Ariz. State Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), dealt with state laws affecting Indians in Indian country.

*Id.* at 691–92, 85 S.Ct. 1242. The federal statute at issue in *People of Togiak v. United States,* 470 F.Supp. 423 (D.D.C.1979) contained a provision that expressly and unequivocally stated that the act in question preempted all state laws on the subject. *Id.* at 425.

*on Corp. v. Governor of Maryland,* 437 U.S. 117, 132, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).

The Borough contends that we should disregard the Supreme Court's holding in *Exxon,* and our own decision in *Chevron,* and look instead to *Broad v. Sealaska Corp.,* 85 F.3d 422 (9th Cir.1996). In *Broad,* we considered the preemptive effect of a section of the Alaska Native Claims Settlement Act (ANCSA) that authorizes Alaska Native Corporations to protect their assets by conveying them into trusts. *See* 43 U.S.C. § 1629e. One subsection prohibits the trusts from discriminating in favor of employees, officers, or directors of the settlor corporation, but is silent on other forms of discrimination. *See* 43 U.S.C. § 1629e(b)(1)(C). We found this scheme sufficient to preempt state laws that proscribe what the federal statute does not:

> ANCSA prohibits settlement trusts that discriminate in favor of corporate insiders, but does not otherwise prohibit trusts that discriminate in favor of other groups of shareholders. This statutory section suggests that ANCSA anticipates that trusts may discriminate in favor of a particular class of shareholders. As a result, a state law that prohibits discriminatory trusts conflicts with ANCSA.

*Broad,* 85 F.3d at 426. Citing this language, the Borough argues that because Title VII prohibits some forms of employment discrimination, but—via § 703(i)— exempts Native American hiring preferences, it evidences Congress' intent that enterprises implement such preferences.

The Borough's reliance on *Broad* is misplaced. Unlike the provisions at issue in *Chevron* and *Exxon,* the statute we considered in *Broad* did not carve out a narrow exception to an expansive prohibitory scheme. Rather, it was part of a compre-

hensive affirmative scheme and plan (ANCSA) whereby Congress created Native Corporations, and defined their corporate powers. *See Broad,* 85 F.3d at 425, 431. The state statute that we found to be preempted was inconsistent with ANCSA because it conflicted with congressional judgment regarding powers the Native Corporations should have.

Section 703(i) is not part of a comprehensive affirmative scheme like ANCSA. Rather, it reflects only the congressional judgment that Title VII should not extend to otherwise valid Native American employment preference programs. State laws that prohibit such preferences are not inconsistent with this purpose, and are not preempted.

The Borough also suggests that *Exxon* and *Chevron* are distinguishable because they each dealt with legislation in areas where, in the Borough's words, "states and the federal government traditionally have exercised broad, concurrent police powers." In contrast, the Borough contends that at issue in this case is an area of law—Indian law—where "Congress has traditionally exercised paramount powers."

Even if the Borough's characterization of the legislation at issue in *Exxon* and *Chevron* were correct, its characterization of the legislation at issue here is not. At issue in this case is not a state law aimed at regulating Indian affairs. It is a state constitutional provision of general applicability that requires equal protection. Congress made clear in the Civil Rights Act that state anti-discrimination laws are important, and are preempted only to the extent that they actually conflict with a provision of the Civil Rights Act. *See Guerra,* 479 U.S. at 281, 107 S.Ct. 683. Section 703(i) presents no conflict with Alaska law, and surely none with the Alaska's Constitution's equal protection clause, because Section 703(i) merely limits the

reach of a federal statute that prohibits a broad range of behavior, nothing more.

Our conclusion is reinforced by considering the implications of a determination that Title VII would preempt any state law that proscribes reverse discrimination favoring Native Americans in employment. Whatever the merit of such an approach if Congress stated a clear intent to do so, such a prohibition cannot be inferred from the language in Title VII carving out an exception to its prohibition. Were Congress to act with a clear purpose to prohibit the states from barring discrimination in favor of Native Americans in employment, we would be faced with a different issue than that presented here.[9] However, the only purpose of Congress that can be fairly seen in Title VII is to exempt otherwise valid programs favoring employment of Native Americans from Title VII's prohibitions.

## CONCLUSION

We hold that Title VII, § 703(i), does not preempt state law that otherwise would prohibit reverse discrimination in employment in favor of members of federally recognized tribes, and we hold that the Ordinance is invalid under the Equal Protection Clause of Alaska's Constitution.

**AFFIRMED.**

---

[9]. If such a clear congressional purpose to preempt were established, we would be faced with difficult federal constitutional issues regarding the permissibility of Native American hiring preferences. *See, e.g., Mancari,* 417 U.S. at 555, 94 S.Ct. 2474; *Rice,* 528 U.S. at 519–20, 120 S.Ct. 1044.(noting limited reach of *Mancari* );  *cf. Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 205–06, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), *and City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 495–96, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).