**CATERPILLAR INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Slip Op. No. 96–158.**
**Court No. 94–03–00167.**

United States Court of
International Trade.

Sept. 20, 1996.

**1242**

Powell, Goldstein, Frazer & Murphy (Richard M. Belanger, Susan P. Strommer, D. Christine Wood), Washington, DC, for plaintiff.

Frank W. Hunger, Assistant Attorney General, Washington, DC; Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, United States Department of Justice, (Susan Burnett Mansfield), New York City; of counsel: Karen P. Binder, Office of Assistant Chief Counsel, United States Customs Service, for defendant.

## Opinion

MUSGRAVE, Judge.

Plaintiff Caterpillar Inc. ("Caterpillar") brings this action to contest the denial by the United States Customs Service ("Customs") of its protest filed pursuant to section 515 of the Tariff Act of 1930, as amended by 19 U.S.C. § 1515. Caterpillar's timely filing of the protest and Customs' subsequent denial thereof affords Caterpillar standing to bring this action. 28 U.S.C. § 2631(a). The Court's jurisdiction over this matter arises under 28 U.S.C. § 1581(a). The legal issue before the Court is whether separately invoiced VAT amounts remitted to a foreign seller are properly included in the appraised transaction value of merchandise under Section 402(b) of the Tariff Act of 1930, codified as amended at 19 U.S.C. § 1401a(b), when the foreign government subsequently refunds those sums to the importer. Caterpillar has moved for summary judgment and the Government has cross-moved for summary judgment. The Court holds that on the facts of this case, the VAT sums remitted by and subsequently refunded to the plaintiff are not properly included in transaction value and the plaintiff is entitled to summary judgment.

## Background

Caterpillar, a domestic corporation, purchased truck components from Artix Limited ("Artix"), a British corporation, pursuant to a written contract executed in 1985 which was periodically amended. The contract listed ex factory prices for the various truck components. The merchandise was not exported immediately following payment but remained in Artix's inventory for up to five months thereafter. The British revenue authorities assessed VAT taxes upon the sale of the merchandise at a rate of 15% *ad valorem* until April 1991, whereupon the rate became 17.5% *ad valorem*. The Court takes judicial notice of the fact that British tax law provides that merchandise destined for export out of the European Customs Union is "zero rated" for VAT purposes, which practical effect results in VAT-free treatment. Darlington and Sandison, 68–8th T.M., *Business Operations in the United Kingdom—Taxa-*

*tion* at A–43 (1994); CIT Rule 44.1 ("The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.") Although the contract of sale did not mention the treatment of any British VAT assessment, the invoice Artix issued to Caterpillar included an amount for the merchandise and a separate amount for the VAT. Caterpillar paid Artix the price for the merchandise and also disbursed to Artix the amount of the VAT assessment. Caterpillar submitted an affidavit to the Court which stated that at the time of contracting and at all times thereafter, Caterpillar anticipated a refund of the sums it remitted to cover the temporary VAT exactions. Following the exportation of the merchandise to the United States, Caterpillar filed for and received full refunds directly from the British government of all VAT sums it disbursed to Artix. These facts are not in dispute.

Customs appraised the merchandise upon the basis of "transaction value" as set forth in 19 U.S.C. § 1401a(b). The parties agree that the transaction value method of appraisement is appropriate in this case. Customs determined that the separately invoiced VAT amounts remitted by Caterpillar were part of the "price actually paid or payable for the merchandise when sold for exportation" under the definition of "transaction value" appearing in 19 U.S.C. § 1401a(b). Caterpillar filed a timely protest alleging that the VAT amounts were improperly included in the transaction value basis. Customs denied the protest and this lawsuit ensued.

### Standard of Review

The Court must determine whether separately invoiced VAT amounts remitted to a foreign seller and subsequently refunded by the foreign government are part of "the price actually paid or payable for the merchandise when sold for exportation to the United States" within the meaning of 19 U.S.C. § 1401a, which provides in pertinent part:

(a) Generally

(1) Except as otherwise specifically provided for in this chapter, imported merchandise shall be appraised, for the purposes of this chapter, on the basis of the following:

(A) The transaction value provided for under subsection (b) of this section.

\* \* \* \* \* \*

(b) Transaction value of imported merchandise

(1) The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to—

(A) the packing costs incurred by the buyer with respect to the imported merchandise;

(B) any selling commission incurred by the buyer with respect to the imported merchandise;

(C) the value, apportioned as appropriate, of any assist;

(D) any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a condition of the sale of the imported merchandise for exportation to the United States; and

(E) the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller. The price actually paid or payable for imported merchandise shall be increased by the amounts attributable to the items (and no others) described in subparagraphs (A) through (E) only to the extent that each such amount (i) is not otherwise included within the price actually paid or payable; and (ii) is based on sufficient information.

\* \* \* \* \* \*

(3) The transaction value of imported merchandise does not include any of the following, if identified separately from the price actually paid or payable and from any cost or other item referred to in paragraph (1):

(A) Any reasonable cost or charge that is incurred for—

(i) the construction, erection, assembly, or maintenance of, or the technical assistance provided with respect

to, the merchandise after its importation into the United States; or

(ii) the transportation of the merchandise after such importation.

(B) The customs duties and other Federal taxes currently payable on the imported merchandise by reason of its importation, and any Federal excise tax on, or measured by the value of, such merchandise for which vendors in the United States are ordinarily liable.

(4) For purposes of this subsection—

(A) The term "price actually paid or payable" means the total payment (whether direct or indirect, and exclusive of any costs, charges, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the place of importation in the United States) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller.

\*     \*     \*     \*     \*     \*

A review of the statutory language reveals that VAT taxes are not enumerated in § 1401a(b)(1)'s explicit list of items to be included in transaction value; nor are they explicitly excluded from transaction value under the items listed in § 1401a(b)(3). The legislative silence on this issue confronts the Court with a question of statutory interpretation, and the Court will uphold Customs' appraisal if and only if it was based on a permissible construction of the statute. *Generra Sportswear Co. v. United States,* 8 Fed. Cir. (T) 132, 134, 905 F.2d 377, 379 (1990) ("because section 1401a(b) does not precisely address whether or not quota payments may be included in transaction value, we determine whether the appraisal was based on a permissible construction of the statute."); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The Government concedes that the approach in *Generra* is applicable to the instant case: "The value statute does not expressly address the question presented. In these circumstances, the interpretation of the statute by the Customs Service will be accepted if it is reasonable (Def.'s Cr.Mot.Summ.J. at 9)

(citing *Generra* ); "[B]ecause the point at issue in this case is not precisely addressed in the statute, the question is whether the agency's construction of the statute is permissible...." (*Id.* at 22). Customs' interpretation of the statute is not entitled to the presumption of correctness afforded by 28 U.S.C. § 2639(a)(1) because that statutory clemency applies only to Customs' factual determinations. *Goodman Mfg., Inc. v. United States,* 13 Fed.Cir. (T) ——, ——, 69 F.3d 505, 508 (1995).

## Discussion

Both parties agree that the case is amenable to summary judgment. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CIT Rule 56(d). It is the province of the Court to determine whether any genuine issue of material fact obstructs a disposition on summary judgment, and in so doing, the Court may not resolve or try factual disputes. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The Court agrees that the relevant documents in the instant case evince agreement on all material facts upon which summary judgment may properly issue.

Since the Court is engaged in an exercise of statutory construction where the statutory language itself is mute, the Court must invoke canons of statutory construction to determine whether the interpretive course Customs has charted is sufficiently reasonable or on the contrary is fraught with unnavigable difficulty. The Government volleys arguments flowing from a hoary canon of statutory interpretation, that of *expressio unius est exclusio alterius.* This canon applies to two sorts of inquiries: the canon counsels that in construing a legislative provision in isolation, the provision's "listing [of] several specific things implies an intention to exclude others" (*Broad v. Sealaska Corp.,* 85 F.3d 422, 433 (9th Cir.1996) (Kleinfeld, J. dissenting); in addition, when construing a heterogenous

legislative scheme, if a legislature "has carefully employed a term in one place and excluded it in another, it should not be implied where excluded" (*Marshall v. Western Union Tel. Co.*, 621 F.2d 1246, 1251 (3d Cir. 1980). Before turning to the Government's arguments, the Court remarks that the invocation of the canon is not without controversy. *Broad*, 85 F.3d at 432–33. Professor Karl Llewellyn salvoed both the thrust of the canon and the facile parry of its momentum in his famous *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed*, 3 Vand.L.Rev. 395, 405 (1950). The Supreme Court itself impugned the canon when it nodded approvingly to a law review article which "recogniz[ed] that the principle *expressio unius est exclusio alterius* 'is a questionable one in light of the dubious reliability of inferring specific intent from silence.'" *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 703, 111 S.Ct. 2524, 2537–38, 115 L.Ed.2d 604 (1991) (quoting Cass R. Sunstein, *Law and Administration After Chevron*, 90 Colum.L.Rev. 2071, 2109, n. 182 (1990)). One scholar dubbed the canon "one of the most fatuously simple of logical fallacies, the 'illicit major,' long the *pons asinorum* of schoolboys." Max Radin, *Statutory Interpretation*, 43 Harv.L.Rev. 863, 873–74 (1930) (citation omitted). Notwithstanding the questionable status of this ventriloquistic canon of statutory construction, the Government argues that it applies forcefully in its favor both to the statute under consideration and to the texts of the 1947 General Agreements on Tariffs and Trade ("1947 GATT") from which the statute descended. The starting point for the substantive inquiry is the progenitorial 1947 GATT texts.

■ Although the original 1947 GATT Art. VII comprised only five sections and did not articulate a comprehensive customs valuation scheme, § 3 of that Article unequivocally prohibited the inclusion of refunded internal taxes in the appraised value of imported merchandise:

> The value for customs purposes of any imported product should not include the amount of any internal tax, applicable within the country of origin or exportation, from which the imported product has been exempted or has been *or will be relieved by means of refund.*

General Agreement on Tariffs and Trade, 61 Stat. A3, T.I.A.S. No. 1700, 55 U.N.T.S. 182 (1947) (emphasis added). The 1979 Agreement on Implementation of Article VII of the General Agreement on Tariffs and Trade, achieved during the Tokyo Round of the Multilateral Trade Negotiations and nominally referred to as the "Customs Valuation Code" ("Code"), established "transaction value" as the primary means for customs valuation within signatory countries: "The customs value of imported goods shall be the transaction value, that is the price actually paid or payable for the goods when sold for export to the country of importation...." Code Art. 1 at 6. The Code's Interpretative Note to Article 1, which constitutes an "integral part" of the Code under the general subsuming clause of Code Article 14, elaborates further on the definition of transaction value: "The price actually paid or payable is the total payment made or to be made by the buyer to or for the benefit of the seller for the imported goods." Code Annex 1 at 25. The Code's *Introduction* declares, "The Code provides a revised set of valuation rules, expanding and giving greater precision to the provisions on customs valuation already found in the GATT, which do not set forth the elements of a complete valuation standard." Code at 3. Although it is undisputed that the British VAT under consideration is an internal tax which was refunded to Caterpillar, the Government points to the Code's transaction value rules which explicitly authorize various exclusions to transaction value without mentioning refunded internal taxes. In particular, Interpretative Note to Article 1 provides for the mandatory exception of certain items from transaction value:

> The customs value shall not include the following charges or costs, provided that they are distinguished from the price actually paid or payable for the imported goods:
>
> (a) charges for construction, erection, assembly, maintenance or technical assistance, undertaken after importation on

imported goods such as industrial plant, machinery or equipment;

(b) the cost of transport after importation;

(c) duties and taxes of the country of importation.

Code Annex 1 at 25. The Government implicitly invokes *expressio unius est exclusio alterius* in arguing that the "Code includes a comprehensive list of what will not be included in the valuation of merchandise if separately identified. . . . If amounts such as the Value Added Tax amounts at issue were to be excluded, they would have been specified on this list." Def.'s Rep. to Pl.'s Resp. to Def.'s Cr.Mot.Summ.J. at 12–13. The Government admits that it "located no statement in the [ ] Code explicitly superseding Section 3 Article VII of the GATT." Def.'s Cr.Mot. Summ.J. at 22. Absent the invocation of the controversial canon, there is not even an implicit derogation from the 1947 GATT Art. VII § 3 in the text of the Code or in its annexed Interpretative Notes; therefore, the Code should be read *in pari materia* with the entire 1947 GATT Art. VII and the Court must reject the Government's contention that the Code's expansionary revisions eviscerated § 3 from the body of the 1947 GATT Art. VII. The conclusion that the 1947 GATT Art. VII § 3 operates upon the Code entails a very important consequence, namely that the drafters of the Code did not intend for refunded internal taxes to be included in the *definition* of "the price actually paid or payable" for purposes of determining transaction value; any other interpretation of the Code would entirely defeat Art. VII § 3 because refunded internal taxes are not listed among the ancillary charges explicitly excluded from transaction value by Interpretative Note 1. The drafters of the Code simply did not deem it necessary to identify refunded internal taxes in the list of exceptions to "the price actually paid or payable" because Art. VII § 3 mandates their exclusion on a definitional level.

It is also worthwhile to observe that refunded internal taxes do not appear among the exclusive litany of mandatory and permissive *additions* to "the price actually paid or payable" contained in Code Article 8:

In determining the customs value under the provisions of Article 1, there shall be *added* to the price actually paid or payable for the imported goods:

(a) the following, to the extent that they are incurred by the buyer but are not included in the price actually paid or payable for the goods:

(i) commissions and brokerage, except buying commissions;

(ii) the cost of containers which are treated as being one for customs purposes with the goods in question;

(iii) the cost of packing whether for labor or materials;

(b) the value, apportioned as appropriate, of the following goods and services where supplied directly or indirectly by the buyer free of charge or at a reduced cost for use in connection with the production and sale for export of the imported goods, to the extent that such value has not been included in the price actually paid or payable:

(i) materials, components, parts and similar items incorporated in the imported goods;

(ii) tools, dies, molds and similar items used in the production of the imported goods;

(iii) materials consumed in the production of the imported goods;

(iv) engineering, development, artwork, design work, and plans. . . .

(c) royalties and licence fees related to the goods being valued that the buyer must pay, either directly or indirectly, as a condition of sale of the goods being valued, to the extent that such royalties and fees are not included in the price actually paid or payable;

(d) the value of any part of the proceeds of any subsequent resale. . . .

2. In framing its legislation, each Party shall provide for the inclusion in or the exclusion from the customs value, in whole or in part, of the following:

(a) the cost of transport of the imported goods to the port or place of importation;

(b) loading, unloading and handling charges associated with the transport of the imported goods to the port or place of importation; and

(c) the cost of insurance.

3. Additions to the price actually paid or payable shall be made under this Article only on the basis of objective and quantifiable data.

4. *No additions shall be made to the price actually paid or payable in determining the customs value except as provided in this Article.*

(emphasis added). Code Article 8 neither mandates nor permits the folding of refunded internal taxes into the transaction value of merchandise. Thus it is clear that both by definitional and illustrative manner the 1947 GATT prohibits refunded internal taxes from being included in the transactional value of imported merchandise. The Court must now consider whether 19 U.S.C. § 1401a carries a congruent prohibition.

Along with other trade related legislation, Congress promulgated 19 U.S.C. § 1401a under the rubric of the Trade Agreements Act of 1979 ("Act") (Pub.L. No. 96–39, 93 Stat. 144, 194 (1979)). The history of the Act indicates Congress's intent to legislate 19 U.S.C. § 1401a in order to conform domestic law to the valuation standards established by the Code: the Act was intended to "revise section 402 of the Tariff Act of 1930, which specifies the method for determining the value of an import for purposes of applying *ad valorem* duties, to make it consistent with the Customs Valuation Agreement negotiated in the [Multilateral Trade Negotiations]" (S.Rep. No. 249, 96th Cong., 1st Sess. 20 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 406); "Title II [of the Act] implements in domestic law the Agreement on Implementation of Article VII of the General Agreements on Tariffs and Trade...." (H.R.Rep. No. 317, 96th Cong., 1st Sess. 78 (1979)). This Court has previously recognized that 19 U.S.C. § 1401a was promulgated specifically to implement the Code. *Texas Apparel Co. v. United States,* 12 CIT 1002, 1005, 698 F.Supp. 932, 935 (1988). Nevertheless, the Government correctly points out that if there exists any inconsistency between the 1947

GATT and the domestic statute, the latter controls:

> While we acknowledge Congress's interest in complying with U.S. responsibilities under the GATT, we are bound not by what we think Congress should do, but by what Congress in fact did. The GATT does not trump domestic legislation; if the statutory provisions at issue here are inconsistent with the GATT, it is a matter for Congress and not this court to decide and remedy.

*Suramerica de Aleaciones Laminadas, C.A. v. United States,* 10 Fed.Cir. (T) ——, ——, 966 F.2d 660, 667 (1992). On the other hand, the secular commitment of the judicial branch to interpret acts of Congress consistently with international agreements was fairly encompassed by a recent decision of the United States Court of Appeals for the Federal Circuit ("CAFC"):

> *GATT agreements are international obligations, and absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations.* The Supreme Court's classic expression of this canon of construction is particularly apt in this case: "It has also been observed that an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country. These principles are believed to be correct, and they ought to be kept in view in construing the act now under consideration."

*Federal Mogul Corp. v. United States,* 13 Fed.Cir. (T) ——, ——, 63 F.3d 1572, 1581 (1995) (emphasis added) (quoting *Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208, 226 (1804)). Given this inveterate canonical duty to interpret the international obligations of the United States consistently with domestic legislation, the prohibition regarding refunded internal taxes embodied in the 1947 GATT militates resoundingly against Customs' proffered construction of 19 U.S.C. § 1401a. It is from the perch of this venerable canon that the

Court surveys the statute and espies the ruinous shoals lurking in Customs' position. The Court is mindful that canons of construction "are not in any true sense rules of law. So far as they are valid, they are what Mr. Justice Holmes called them, axioms of experience." Justice Felix Frankfurter, *Some Reflections on the Reading of Statutes* 27 (1947). The indefinite statute and competing canons of construction confront the Court with "a choice between uncertainties. [The Court] must be content to choose the lesser." *Burnet v. Guggenheim,* 288 U.S. 280, 288, 53 S.Ct. 369, 372, 77 L.Ed. 748 (1933) (J. Cardozo).

■ In order to prevail in its proposed exegesis of the statute, the Government must convince the Court that Congress intended 19 U.S.C. § 1401a to deviate from the prohibition in the 1947 GATT Art. VII § 3 and the Code which it inspired. In an attempt to establish the pertinent inconsistency, the Government invokes both applications of its preferred canon of construction: in 19 U.S.C. § 1401a(b)(3)(B), Congress enumerated specific charges to be excluded from transaction value without mentioning refunded internal taxes; in 19 U.S.C. § 1401a(e)(2)(A), Congress explicitly excluded refunded internal taxes from "computed value" calculations, and it failed to provide likewise for transaction value. The first argument is identical to that rejected by the Court in connection with the analysis of the 1947 GATT texts and need not be addressed at length. Suffice it to say that the insinuations of silence do not overcome the paramount duty to interpret domestic legislation consistently with the 1947 GATT, and the supranational agreement can be amicably reconciled with the domestic statute by inferring that Congress did not explicitly except refunded internal taxes from transaction value because it considered such taxes to be outside the domain of the "price actually paid or payable" definition.

■ Customs' second application of *expressio unius est exclusio alterius* weighs somewhat more heavily in its favor: "Congress did not expressly exclude amounts like those at issue from the transaction value, when, in other parts of the statute, it did exclude tax amounts from the valuation of

merchandise." Def.'s Rep. to Pl.'s Resp. to Def.'s Cr.Mot.Summ.J. at 12. In particular, the provision on "computed value", 19 U.S.C. § 1401a(e)(2)(A), reads as follows:

· (e) Computed value

 (1) The computed value of imported merchandise is the sum of—

  (A) the cost or value of the materials ...;

  (B) an amount for profit and general expenses ...;

  (C) any assist, ...; and

  (D) the packing costs.

 (2) For purposes of paragraph (1)—

  (A) *the cost or value of materials under paragraph (1)(A) shall not include the amount of any internal tax imposed by the country of exportation that is directly applicable to the materials or their disposition if the tax is remitted or refunded upon the exportation of the merchandise in the production of which the materials were used;*

  * * * * * *

(emphasis added) Unfortunately for the Court, there is virtually no conjugate legislative history illuminating the incentives for this express language; the language on refunded internal taxes appearing in the "computed value" provision is shrouded in silent cloth. The only relevant Congressional palaver appearing in the legislative history states, "The computed value standard under the proposed law conceptually follows the constructed value standard under [the present valuation section]...." (H.R.Rep. No. 317, 96th Cong., 1st Sess., 94 (1979); S.Rep. No. 249, 96th Cong., 1st Sess., 122 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 508), and as discussed *infra,* the former constructed value standard excepted refunded internal taxes from its dutiable basis. Whatever were the motivations of the legislature in adding the relevant language, the crucial point is simply that any pregnant negative to be inferred from the "computed value" provision fails the *Federal Mogul Corp.* criterion of "express Congressional language to the contrary" of the 1947 GATT texts. The Gov-

ernment has not pointed to any express Congressional language, either in the statute itself or in its conjugate legislative history, which sounds in contravention of the prohibition contained in the 1947 GATT Art. VII § 3; nor has the Court discovered any such language on its own investigation. It would be curious indeed to discover that language. The United States had sought revisions of the 1947 GATT in the Tokyo Round Multilateral Trade Negotiations; "[s]pecifically such revisions were to include ... border adjustment for internal taxes...." H.R.Rep. No. 317, 96th Cong., 1st Sess., 8 (1979). The United States not only failed to achieve this objective but wound up embracing Art. VII § 3 in the negotiations that led to the drafting of the Code: "*Except for reaffirming current rules in the GATT with respect to the treatment of border adjustment for internal taxes,* the MTN did not deal with the disadvantage that many in the United States perceive for countries, such as the United States, which rely primarily on direct rather than indirect taxes for revenue needs." *Id.* at 21. (emphasis added). Contrary to the Government's position, this express Congressional language may be read as an endorsement of Art. VII § 3 by the Code and the derivative domestic statute. Upon these bases the Court finds that the venerable canon of construction to interpret Congressional acts consistently with international obligations overcomes the exercise in ventriloquism urged upon the Court by the Government: *ceteris paribus* with the facts of this case, Customs may not include VAT taxes which are reimbursed to the importer in the appraised value of imported merchandise.

The Court's ruling is corroborated by examining the tortuous metamorphosis of domestic valuation provisions over the past fifty years and the accompanying legislative history. Shortly after the 1947 GATT agreement was executed by President Truman, a bill was introduced in the United States House of Representatives which sought to amend, *inter alia,* the valuation provisions of the Tariff Act of 1930. H.R. 8304, 81st Cong., 2d Sess. (1950). H.R. 8304 proposed four different bases for valuation in its § 13, and subsection 13(f) mimicked Art. VII § 3 of the 1947 GATT:

13(f) *Taxes:* The value of imported merchandise ascertained or estimated in accordance with this section shall not include the amount of any internal tax, applicable within the country of exportation, from which the merchandise undergoing appraisement has been exempted or has been or will be relieved by means of a refund.

Although the bill fell stillborn into the lap of the Committee on Ways and Means, an identical bill was introduced the following year as H.R. 1535, 82d Cong., 1st Sess (1951). H.R. 1535 enjoyed a longer life span than its predecessor and propogated lengthy legislative hearings and debates. The hearings publicized the Treasury Department's express intention to conform U.S. law to Art. VII § 3 and also revealed the public's disapproval of a perceived surrender of sovereignty by unratified executive fiat. In response to a request from the Committee on Ways and Means, the Treasury Department explained that H.R. 1535 § 13 was drafted to conform with Art. VII of the 1947 GATT. *Simplification of Customs Administration: Hearings on H.R. 1535 Before the Committee on Ways and Means,* 82d Cong., 1st Sess. 79 (1951) (Treasury Department, Explanation of Sections of H.R. 1535 Which Are Contained in the General Agreement on Tariffs and Trade Or International Trade Organization Charter) (request appearing at 202). Also included in those hearings was a memorandum from the United States Tariff Commission authored in connection with the initial and identical bill, H.R. 8304, which memorandum explained the multifaceted importance of excluding refunded internal taxes from dutiable value:

Subsection [13](f) ... as set forth in section 13 of the bill is a new provision which would preclude from consideration in determining dutiable value any internal tax applicable within the country of origin or exportation from which the merchandise undergoing appraisement has been exempted or will be relieved by means of refund. *One of the most prolific sources of litigation in customs appraisement is the question as to whether a particular internal tax imposed in the country of exportation with respect to sales for domestic*

*consumption is to be included in the dutiable value of such · merchandise even though the tax is not applied to exports.* The situation has become so complex that the determination in a particular case of whether or not the tax is to be included in dutiable value, depends upon the fortuitous circumstances of the time when and the manner in which the tax accrues. At the present time the customs authorities are not at all certain under what circumstances a tax is or is not to be included in dutiable value. *After considerable study of this question by various experts, it seems to be the general consensus that the inclusion of dutiable value of internal taxes which have not been applied to, or which have been refunded with respect to, the merchandise undergoing appraisement, is not reasonable or desirable. The exclusion of such taxes will simplify customs administration and facilitate a nearer approach to the objective of assessing ad valorem duties on the actual value of the merchandise.* Exclusion of such taxes from dutiable value would be required to make GATT (art. VII, par. 3) definitively effective. . . .

*Id.* at 232 (Memorandum of United States Tariff Commission for the Committee on Ways and Means on H.R. 8304) (emphasis added).

In opposing H.R. 1535, the Secretary of the American Tariff League, Richard H. Anthony, testified:

This bill, if enacted in its present form, would permit the President to deposit an instrument of acceptance of GATT, and thus pave the way for its entering into full force despite lack of express congressional ratification. We submit that we are reasonably justified in believing that definitive acceptance of, and full commitment to, GATT rather than an objective approach to customs simplification has dictated the ingredients of this bill. . . .

The Chairman. Are there any questions? . . .

Mr. Jenkins. How much complaint has there been made to the authorities that are now promulgating the GATT provisions and foisting their practices on us? What

shape does that complaint take? Has it been positive and clear?

Mr. Anthony. Congress, of course, has been positive by inserting a caveat in the [Trade Agreements Extension Act of 1951] stating that the extension was not to be considered as approval or disapproval of the provisions of GATT. . . .

Mr. Reed. Is it your opinion that the provision listed in the extension of the Trade Agreements Act should be left in that act, if this bill should be reported out, in order to stress the fact that this bill does not indicate approval of ITO or GATT?

Mr. Anthony. Yes; we would like to see that done.

*Id.* at 421, 427, 430 (statement of Richard H. Anthony, Secretary, The American Tariff League, Inc.). H.R. 1535 was amended and reintroduced as a clean bill designated H.R. 5505, 82d Cong., 1st Sess. (1951). H.R. 5505 retained the exact language on refunded taxes contained in H.R. 1535, but it also included the demurrer sought by the public: § 24 read, "The enactment of this Act shall not be construed to determine or indicate the approval or disapproval by the Congress of the Executive Agreement known as the General Agreement on Tariffs and Trade." In its report on H.R. 5505, the Committee on Ways and Means explained the genesis and evolution of the intended revisions to Customs laws:

The administrative and procedural provisions of the customs laws have been generally revised only once since the enactment of the Tariff Act of 1930. That revision was made by the Customs Administrative Act of 1938 (act of June 25, 1938, 52 Stat. 1077). Since that time many changes have occurred in industry and commerce which necessitate a further revision of these provisions. Congress has already recognized the need for such revision by appropriating funds in the appropriation for the Bureau of Customs for the fiscal year 1948 for a survey of the customs service. With these funds, a private firm of management consultants, McKinsey & Co., was employed by the Treasury Department to make studies in management improvement. . . .

H.R. 1535, which was introduced by the chairman of [the Committee on Ways and Means] at the request of the Secretary of the Treasury, contained provisions which had as their main source the recommendations of McKinsey & Co.... [The Committee on Ways and Means] held extensive hearings on H.R. 1535 and deliberated at length on it in executive sessions. H.R. 5505 was introduced as a clean bill and reflects [the] committee's decisions on, and amendments to, H.R. 1535.

H.R.Rep. No. 1089, 82d Cong., 1st sess. 2 (1951). H.R. 5505 was passed by the House in October 1951 and referred to the Senate, where it perished after extensive hearings.

The 83d Congress witnessed the fourth reincarnation of the value provisions originally tendered by H.R. 8304: the valuation provisions in § 15 of H.R. 5106, 83d Cong., 1st Sess. (1953) were nearly a verbatim of the H.R. 8304 valuation provisions. The House hearings on 5106 provoked familiar criticism:

[T]he proposed valuation provisions contained in section 15 of H.R. 5106 are designed to bring the valuation provisions of our tariff law into conformity with the provisions of GATT and the rejected ITO Charter. This is indicated by the Tariff Commission's memorandum to this committee when H.R. 1535 was under consideration 2 years ago.... The Habana Charter for an ITO was rejected, and the GATT has never been ratified by the Congress. An attempt to secure the piecemeal acceptance of a defunct ITO charter and GATT in the guise of a customs simplification bill should not be tolerated by the Congress.... We strenuously oppose the enaction of section 15 for the reasons which I have stated. Should any provision be retained in the bill as it leaves this committee which is derived or closely similar to corresponding provisions of the GATT, we recommend that a provision be added to the bill making it clear that its enactment shall not be regarded as an approval of the GATT. [Adding a provision similar to s]ection 24 of H.R. 5505, 82d Congress, 1st Session, would be appropriate for this purpose.

Customs Simplification: Hearings on H.R. 5106 Before the Committee on Ways and Means, 83d Cong., 1st Sess. 153, 161 (1953) (statement of Dr. Cary Wagner, President, The Synthetic Organic Chemical Manufacturers Association of the United States, and The Manufacturing Chemists Association) H.R. 5106 was amended in respects unrelated to the valuation provisions and was reintroduced as H.R. 5877, 83d Cong., 1st Sess., (1953). H.R. 5877 was reported favorably by the House but the GATT-inspired § 15 valuation provisions did not survive the bill as it was reported by the Senate and subsequently enacted into law as the Customs Simplification Act of 1953, ch. 397, 67 Stat. 507 (1953). The Senate Report explained:

Because of the urgency of the bill, and because of the delay in the receipt of it from the House, extensive hearings have not been possible. For this reason two sections which were highly controversial have been deleted by the committee and their study postponed until a later date. In reporting favorably on this bill the committee does so, and acted on the bill in committee, without relation to the executive agreement known as the General Agreement on Tariffs and Trade (GATT), which was not approved or disapproved.

## AMENDMENTS

Two sections of the bill received from the House are not in the bill as reported by the Finance Committee. Section 15 of the House bill would have made substantial changes in the methods of ascertaining the dutiable value of goods being imported into the United States.... This section was highly controversial and the Finance Committee felt that it would not be justified in adopting it without hearings, which, judging from the volume of requests for hearings on that section, would have been rather extended. Time would not permit such hearings at this session.

S.Rep. No. 632, 83d Cong, 1st Sess., 2 (1953), reprinted in 1953 U.S.C.C.A.N. 2283, 2283–84.

The valuation reformers finally achieved their goal in the 84th Congress. A slightly modified version of the valuation revisions

originally proposed by H.R. 8304 was introduced to the Committee on Ways and Means as H.R. 6040, 84th Cong., 1st Sess. (1955). One month after its introduction, H.R. 6040 was summarily reported by the committee. H.R.Rep. No. 858, 84th Cong., 1st Sess. (1955). The primary valuation basis would be "Export Value", defined as "the price, *at the time of exportation to the United States* of the merchandise undergoing appraisement, at which such or similar merchandise is freely *sold . . . for exportation to the United States . . .* plus . . . all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States." H.R.Rep. No. 858 at 18 (emphasis added). The second basis would be "United States Value," defined as "the price . . . at which such or similar merchandise is . . . offered for sale in the principal market of the United States for domestic consumption. . . ." *Id.* The third basis would be "Constructed Value," defined as "the sum of (1) the cost of materials (*exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used*) . . ., (2) an amount for general expenses and profit, and (3) the cost of all containers and coverings. . . ." *Id.* (emphasis added). The fourth basis would be "American Selling Price," defined as "the price . . . at which such article is freely sold . . . or offered for sale for domestic consumption in the principal market of the United States. . . ." *Id.* The bill passed the house and was referred to the Senate. The Senate Committee on Finance subjected the bill to lengthy hearings and failed to report favorably during the first session of Congress; however, in the second session the Finance Committee reported favorably on an amended version of H.R. 6040. The amended version of H.R. 6040 retained the controversial valuation revisions but provided that valuation provisions already in existence would continue to apply to sensitive merchandise; the amendment was adopted in order to address the concern that the new valuation standards would reduce government revenue and expose domestic producers to increased competition. Unlike previous episodes, the legislative history generated in connection with H.R. 6040 did not betray any Congressional intent to conform United States valuation law to the 1947 GATT; perhaps clandestine intent constituted the winning strategy. Evidently, the Senatorial tide that rose as a nemesis to revisions during previous Congresses had ebbed into a strident minority voice:

> Inherent in the bill as amended is the assumption that a 5 percent decrease in valuation will not significantly affect the tariff protection afforded by the existing valuation standards. Any such premise is invalid. . . . The people generally are only now becoming aware of the fact that beginning with the 1934 Trade Agreements Act that [sic] every move, GATT, ITO, [Organization for Trade Cooperation], customs simplification, billions in Europe [sic], International Monetary Fund and many other organizations, and much proposed legislation form a concentrated attack on the economy of this Nation—and a leveling of our standard of living with that of the low-wage living standard nations of the world.

S.Rep. No. 2560, 84th Cong., 2d Sess 25, 28 (1956), *reprinted in* 1956 U.S.C.C.A.N. 4179, 4191 (minority views of Sen. George W. Malone). The amended bill passed the Senate and the House and was enacted as the Customs Simplification Act of 1956, ch. 887, 70 Stat. 943 (1956). These valuation provisions remained in force until the promulgation of the 1979 Trade Agreements Act.

Under the novel valuation provisions of the Customs Simplification Act of 1956 ("1956 Act"), the VAT taxes presently under consideration could not have been included in dutiable value as a practical matter. Appraisal under "Export Value" would have required Customs to ignore the temporary imposition of British VAT on the subject merchandise. This is because "Export Value" was the price, at the time of exportation to the United States, of such or similar merchandise freely *sold for exportation to the United States.* The Court takes judicial notice of the undisputed fact that current British law does not impose VAT taxes on merchandise it deems to be sold for exportation out of the

European Customs Union. It is not apparent to the Court why the British authorities insisted on assessing VAT taxes upon the merchandise at issue; yet the subsequent refund of VAT taxes, which retrospective benefit Customs enjoyed when it appraised the merchandise, objectively demonstrates that the exported merchandise was entitled to VAT-free treatment. Since "Export Value" would have required Customs to appraise the merchandise at its value when sold for exportation to the United States, and since merchandise sold for exportation from Great Britain to the United States is not subject to VAT tax, the "Export Value" basis would have required Customs to look through the cryptic interim decision of the British revenue authorities and to appraise the merchandise at the time when it was uncontroversially sold for exportation and accordingly immune from VAT. The next basis of appraisal under the 1956 Act, the "United States Value", was the domestic price of the imported merchandise. Such a dollar denomination could not include VAT taxes denominated in foreign currency as a simple matter of logic, and the cost of internal taxes subsequently refunded would have been subtracted from the domestic price as a matter of market practice. Appraisal under "Constructed Value" expressly required Customs to back out refunded VAT taxes from the dutiable value. Finally, appraisal under "American Selling Price" looked to "the selling price of domestic products in the United States", which obviously would not include foreign taxes. Despite the acquired Congressional diffidence at expressing an intent to conform valuation law to the 1947 GATT, it is clear that the 1956 Act would have proscribed Customs from including refunded internal taxes in the dutiable value of merchandise.

A principal lesson to be gleaned from this analysis of the 1956 Act is that Customs should have disregarded the temporary assessment of VAT taxes to Caterpillar's merchandise when Customs performed its appraisal under the *transaction value* provision. As the legislative history to the 1979 Trade Agreements Act explains, the transaction value basis of appraisal is substantially equivalent to the former "Export Value" basis: "While transaction value is a different basis of value than export value, the practical effects in terms of differences in appraised values appear to be minimal." H.R.Rep. No. 317, 96th Cong., 1st Sess., 91 (1979); S.Rep. No. 249, 96th Cong., 1st Sess., 119 (1979), *reprinted in* U.S.C.C.A.N. 381, 505. In place of "Export Value"'s triply inculcated mandate that Customs was to appraise merchandise as it was sold for exportation, at the time of its exportation, and packed ready for exportation, the transaction value provision assimilates the mandate by ordaining that dutiable value shall be the price paid "for the merchandise *when sold for exportation.*" To confirm the mandate that Customs must calculate the transaction value of merchandise at a value when it is considered sold for export, the "price actually paid or payable" is defined as "the total payment ... made, or to be made, *for imported merchandise....*" 19 U.S.C. § 1401a(b)(4)(A) (emphasis added). In applying the transaction value provision, it is therefore necessary to determine dutiable value by discounting evanescent assessments of foreign internal taxes which are refunded on merchandise imported into the United States.

The Government argues along a different front that its position is required by two decisions from the CAFC, *Moss Manufacturing Co., Inc., v. United States,* 8 Fed.Cir. (T) 40, 896 F.2d 535 (1990), and *Generra Sportswear Co. v. United States,* 8 Fed.Cir. (T) 132, 905 F.2d 377 (1990). In *Moss,* the plaintiff alleged that the "buying commission" it paid to its offshore subsidiary was improperly included in transaction value because the buying commission was not paid "for the merchandise" under 19 U.S.C. § 1401a(b)(4)(A). The function of the subsidiary was to source merchandise, negotiate contractual terms, and entertain customers. In exchange for these services, the plaintiff remunerated the subsidiary just enough to satisfy the subsidiary's normal operating expenses; pursuant to that arrangement, the plaintiff paid its subsidiary only on selected transactions. This inconsistent treatment revealed itself on entry documents and prompted Customs to review several hundred of plaintiff's entries.

In the test case before the CAFC, the purchase order from the plaintiff to the foreign seller separately itemized the price for the merchandise and an amount for the buying commission. However, the plaintiff financed the payment by means of a negotiable letter of credit which aggregated these two sums and did not separately itemize the buying commission; at trial, the plaintiff explained that it was the seller's duty to remit the amount of buying commission to the subsidiary. The commercial invoice submitted to Customs also failed to itemize separately the amount of the buying commission. Furthermore, the purchase order, commercial invoice, and letter of credit all reflected discrepant amounts paid for the merchandise. The plaintiff argued that the commission paid to its affiliate was a bona fide buying commission and therefore that Customs had erroneously included the commission in the transaction value appraisement. In upholding the trial court's finding that the bona fide nature of the buying commission had not been adequately demonstrated, the CAFC reasoned that *inter alia,* the alleged buying commission was not separately itemized and the plaintiff failed to explain the discrepancies in the documents (*Moss,* 8 Fed.Cir. (T) at 43, 896 F.2d at 538). Although the trial court had voiced its opinion that "it is settled law under [the transaction value] scheme that a bona fide buying commission is excludable from dutiable value...." (*Moss Manufacturing Co., Inc., v. United States,* 13 CIT 420, 425, 714 F.Supp. 1223, 1228 (1989) (citations omitted)), the CAFC demurred on the legal issue: "whether a bona fide buying commission constitutes a payment 'for merchandise' within the meaning of the statute is a question we need not decide." *Moss,* 8 Fed.Cir. (T) at 44, 896 F.2d at 539. Nevertheless, the CAFC pointed out that the legal issue involving buying commissions, which are neither expressly included or excluded from transaction value, is a definitional one: "Monies paid to agents like [plaintiff's subsidiary] are non-dutiable only if they do not otherwise fit within the definitions of statutorily relevant terms like 'price paid or payable' upon which 'transaction value' for appraisal purposes is based." *Moss,* 8 Fed.Cir. (T) at 43 n. **, 896 F.2d at 538 *n.* ** [sic].

The CAFC also cited its concern for the efficiency of Customs' appraisal procedures and refused to "require Customs to engage in the formidable fact-finding task envisioned by [plaintiff]" necessary to determine the bona fide nature of the buying commission. *Moss,* 8 Fed.Cir. (T) at 44, 896 F.2d at 539.

*Moss* is distinct from the instant case in several important ways. Like buying commissions, the question of whether refunded internal taxes are includable in transaction value is fundamentally a definitional issue as the Court has demonstrated *supra.* Yet the resolution of the similar semantic issue is guided by very different historical circumstances. Article 8 of the Customs Valuation Code proclaimed that buying commissions were *not* to be included in transaction value:

> In determining the customs value under the provisions of Article 1, *there shall be added* to the price actually paid or payable for the imported goods:
>> (a) the following, to the extent that they are incurred by the buyer but are not included in the price actually paid or payable for the goods:
>>> (i) commissions and brokerage, *except buying commissions;* ...

(emphasis added). However, the domestic legislation implementing Code Article 8 failed to adopt this specific exclusion: under 19 U.S.C. § 1401a(b)(1)(B), Congress directed Customs to fold into transaction value "any selling commission incurred by the buyer with respect to the imported merchandise," but 19 U.S.C. § 1401a(b)(3) does not list buying commissions among the explicit exemptions to transaction value. Without pretending to decide the legal issue held open by the CAFC, the Court remarks in passing that Congress's failure to follow this particular directive appearing for the first time in the Code could support an inference that Congress thereby intended a derogation. No such argument could be advanced with respect to refunded internal taxes upon which the Code is silent and the 1947 GATT is vociferous. Nor was there any conceivable argument in *Moss* that the buying commission was not paid in connection with merchandise as it was "sold for exportation to the United States." On the factual plane, the

plaintiff in *Moss* did not argue that the buying commissions were refunded. Unlike the conflicting documents presented in *Moss,* the documents in the instant case contain consistent and separately itemized entries designating the amount of funds remitted for VAT and subsequently refunded. In addition to satisfying the tremendously important condition of separate itemization, these documents obviated any need for Customs to engage in a formidable fact-finding investigation: between the entry documents, the refund receipts, the written contract, and the British statute, Customs possessed all of the facts it needed to perform its appraisal. Customs may not prevail in its statutory interpretation by virtue of a minimalistic view of its investigatory obligations. For all these reasons, the Court finds that the *Moss* precedent does not control the case at hand.

The plaintiff in *Generra* advocated that "quota charges" which were remitted to the foreign seller by the domestic purchaser's affiliated offshore buying agent were not paid "for imported merchandise" under the definition of the "price actually paid or payable" set forth in 19 U.S.C. § 1401a(b)(4)(A). *Generra,* 8 Fed.Cir. (T) at 135, 905 F.2d at 380. The foreign seller was obliged to purchase export licenses pursuant to its government's scheme to comply with a voluntary restraint agreement, and such licensing costs were labeled "quota charges." Quota charges are neither included nor excluded explicitly from transaction value under the statute, so the issue was one of statutory interpretation analogous to the instant case. *Generra,* 8 Fed.Cir. (T) at 134, 905 F.2d at 379. The foreign seller invoiced the plaintiff for the cost of the merchandise and separately invoiced the plaintiff's affiliate for the quota charges. The entry documents exhibited the separate invoices and Customs included the quota charges paid by the affiliate in the appraised transaction value. In ruling that it was permissible for Customs to include the quota charges in transaction value, the CAFC reasoned that

> "[a]s long as the quota payment was made to the seller in exchange for merchandise sold for export to the United States, the payment properly may be included in transaction value, even if the payment rep-

resents something other than the *per se* value of the goods.... [T]ransaction value may encompass items other than the pure cost of the merchandise...."

*Generra,* 8 Fed.Cir. (T) at 135, 905 F.2d at 380. In expounding on this notion that consideration paid for exported merchandise may reflect components other than the pure cost of the goods, the CAFC reasoned, "[The fact] that a foreign seller must obtain quota before he can export goods to the United States reasonably indicates that quota payments are part of the 'price actually paid or payable for the merchandise when sold for exportation to the United States.'" *Id.* As in *Moss,* the court also emphasized, "Congress did not intend for the Customs Service to engage in extensive fact-finding to determine whether separate charges, all resulting in payments to the seller in connection with the purchase of imported merchandise, are for the merchandise or something else." *Id.*

Important distinctions between *Generra* and the instant case are obvious. In *Generra,* the plaintiff did not argue or offer evidence demonstrating either that the quota charges were refunded or that they were not paid for merchandise designated for exportation. Nor are quota charges addressed in the Code or the 1947 GATT. More important, it is manifest that Caterpillar did not offer the sums remitted to cover the British VAT as part of the consideration for the merchandise. The legislative history of the Trade Agreements Act explains that transaction value was designed to capture the actual terms of consideration offered by the importer: "The use of transaction value as the primary basis for customs valuation will allow use of the price which the buyer and seller agreed to in their transaction as the basis for valuation...." H.R.Rep. No. 317, 96th Cong., 1st Sess., 91 (1979); S.Rep. No. 249, 96th Cong., 1st Sess., 119 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 505. What constitutes consideration in a contract is a mixed question of law and fact requiring the court to determine the detriment offered in exchange for the benefit received. The material facts allowing the Court to determine the consideration offered by Caterpillar for the merchandise it received are estab-

lished in the record by the written contract, commercial invoices, VAT refund documents, and a sworn affidavit by a competent Caterpillar employee. The written contract, attached as Exhibit I to the Government's Cross Motion for Summary Judgment, includes price lists which do not include VAT amounts. The invoices, attached as Exhibit B–1 to Plaintiff's Motion for Summary Judgment, contain separately itemized prices for the merchandise and for the VAT amounts. Finally, the sworn affidavit of Randy L. Wiese, an employee of Caterpillar since 1968 and Supervisor of Contracts for Caterpillar from 1986 to 1991, states the following:

> At the time the [1985] Manufacture Agreement with Artix was entered into, and at all times subsequent, Caterpillar anticipated that the amount of the VAT collected by Artix would be refunded to Caterpillar by the U.K. government upon proof of the exportation of the merchandise. Specifically, at no time did either party alter or negotiate prices for the merchandise based on consideration of the fact that, in addition to the price for the merchandise, the VAT would also be collected by Artix.

Pl.'s Resp. to Def.'s Cr.Mot.Summ.J., Ex. B–1 at ¶ 7. Mr. Wiese's authority and long-standing employment within Caterpillar render him competent to testify to these facts.

The Government makes a perfunctory attempt to cast doubt on the reliability of Mr. Wiese's sworn testimony by arguing, "The affidavit of Randy L. Wiese does indicate that he was at least employed by Caterpillar since 1968, but it does not specifically state what position Mr. Wiese occupied in 1985 or that he had anything to do with the contract between Caterpillar and Artix in 1985." The Court is convinced that Mr. Wiese's position as Supervisor of Contracts beginning in 1986 engendered him with sufficient knowledge to testify about Caterpillar's intent with regard to the 1985 contract, especially since he was Supervisor during the various amendments to the contract and naturally would have been educated about the history of the contracts he supervised. Mr. Wiese's presumed absence at the negotiating table in 1985 does little to persuade the Court that he is ignorant of the corporate intent prevailing at that time, and he has sworn to the contrary. In any event, the Government concedes the crucial point by admitting that "[a]t most, Caterpillar and Artix were aware that Caterpillar would receive refunds of the Value Added Tax amounts at the time the contract was entered into." Def.'s Repl. to Pl.'s Resp. to Def.'s Cr.Mot.Summ.J. at 15. The established material facts show that Caterpillar never envisioned a permanent deprivation of the substantial *ad valorem* VAT amount at the time of contracting or at any time thereafter, so Caterpillar did not offer the VAT sums as detriment in exchange for the value of the merchandise. It is undisputed that Caterpillar received refunds of the VAT sums. These observations entail that the VAT amounts Caterpillar remitted to Artix did not operate as consideration for the merchandise. The VAT conveyance was therefore akin to a bailment and unlike the payment of quota charges in *Generra* where the Court propounded that "as long as the quota payment was made to the seller *in exchange for merchandise* sold for export to the United States, the payment properly may be included in transaction value." *Generra*, 8 Fed.Cir. (T) at 135, 905 F.2d at 380 (emphasis added). Furthermore, unlike the quota charges at issue in *Generra*, the payment of British VAT was not a condition precedent to exporting the merchandise to the United States, a circumstance that would have cast the VAT disbursements in the role of consideration. Rather, the VAT disbursements were required merely because the British authorities were not certain that the merchandise *would* be exported. These distinctions remove Caterpillar's VAT conveyances from the purview of the "price actually paid or payable for the merchandise when sold for exportation to the United States."

The VAT conveyances by Caterpillar functioned as bailments. In its response brief, Caterpillar explained that "[this] arrangement was intended to benefit ... Artix by providing predictable ... cash flow to Artix...." Pl.'s Resp. to Def.Cr.Mot.Summ.J. at 27, n. 11. It is undisputed that Artix was required to remit the VAT amounts to the British government, and Caterpillar provided those amounts to Artix in its justified anticipation of an eventual refund. The Govern-

ment correctly points out that the time-value of the bailment was "to, or for, the benefit of the seller" under 19 U.S.C. § 1401a(b)(4). Indeed, in *Moss* the CAFC remarked that the foreign seller "benefited, even if slightly, from its temporary possession of the payment ultimately remitted to [the buyer's affiliate]. The small 'float' [the seller] enjoyed on this payment is ... significant to us...." *Moss,* 8 Fed.Cir. (T) at 44, 896 F.2d at 539. Nevertheless, for one very important reason this remark cannot be construed to authorize the inclusion of the refunded taxes in transaction value: such a finding would work a *reduction ad absurdum* of the 1947 GATT Art. VII § 3. As pointed out earlier, the United States obligation to the 1947 GATT was reaffirmed by the Tokyo Round Multilateral Trade Negotiations and incorporated into the Trade Agreements Act. The only situation in which the prohibition contained in Art. VII § 3 could possibly apply is where a buyer has disbursed amounts to cover temporary assessments of internal taxes. The Government argues that Caterpillar's VAT-related disbursements were made "to" the seller under the statute and thereby were properly included in transaction value. Moreover, the Government suggests that if Caterpillar had paid the VAT amounts directly to the British government, those sums still would have been includable in transaction value because Artix was liable to the British government for the VAT assessments: "we note that if [a] payment of the Value Added Tax directly to the United Kingdom [government] were made for the benefit of the seller, then it would be included in the 'price actually paid or payable for the merchandise....'" Def.'s St. Mat. Facts Not in Disp., at 5, ¶ 13. The Court notes that Government counsel's client disagrees with counsel on the latter position: "if the arrangement between Caterpillar, Artix, and the British tax authority were slightly different, the VAT payments would not be ... dutiable (*if the VAT payments were not made to the seller* )." Pl.'s Mot.Summ.J., Ex. C, at 7 (opinion of Mr. John Durant, Director, Commercial Rulings Division) (emphasis added). In any event, the Government's position before the Court is that any VAT-related remittance by Caterpillar, whether it were to the seller or to the foreign tax collector, would be includable in transaction value. Assent to that position would entirely frustrate Art. VII § 3 which could logically operate only when such a remittance had been forwarded by the buyer. Although the time-value of the remittance may have been properly included in transaction value, that is not the issue before the Court. The only way to make sense of international obligations under the pertinent 1947 GATT article and the domestic statute which incorporated those obligations is to hold that the squarely applicable prohibition prevents Customs from including refunded VAT taxes in transaction value.

It may be that this decision adds incrementally to the fact-finding burdens placed on Customs; nevertheless, the Court would view this as a minor cost of doing business under the overwhelming auspices of the 1947 GATT. A more likely result is that the efficiency of customs administration will be enhanced by this decision, for the Court is in company with the erudite report of the former Tariff Commission opining that "[t]he exclusion of such taxes [from dutiable value] will simplify customs administration and facilitate a nearer approach to the objective of assessing *ad valorem* duties on the actual value of the merchandise." (*Simplification of Customs Administration: Hearings on H.R. 1535 Before the Committee on Ways and Means,* 82d Cong., 1st Sess. 232 (1951)) (Treasury Department, Explanation of Sections of H.R. 1535 Which Are Contained in the General Agreement on Tariffs and Trade Or International Trade Organization Charter). If the leading authority in the Executive Branch was so convinced of attendant efficiency enhancements forty-five years ago, the Court is even more so convinced due to the computer age assets available to today's Customs Service.

### Conclusion

Customs' assessment of the transaction value standard, as provided for in Section 402(b) of the Tariff Act of 1930, codified as amended at 19 U.S.C. § 1401a(b), is impermissible. Customs may not include refunded foreign VAT taxes in the dutiable basis of merchandise. The Court's holding is founded on the correct

interpretation of the statutory language, legislative history spanning three decades, 1947 GATT obligations, and canons of construction.

### *JUDGMENT*

This case having been duly submitted for decision following plaintiff's Motion for Summary Judgment, and the Court, after due deliberation, having determined that the amount of the value-added tax payments made by Caterpillar and subsequently refunded by the U.K. government is not properly included in the "price actually paid or payable" for the subject merchandise when sold for exportation within the meaning of 19 U.S.C. § 1401a(b)(1); now, therefore, in accordance with this decision,

**IT IS HEREBY ORDERED** that plaintiff's motion is granted, and the United States Customs Service is instructed to reliquidate the subject entries in accordance with the Court's decision, and to refund the duties collected on the amount of the value-added taxes paid by Caterpillar and refunded by the U.K. government, together with interest to the extent provided by law.